## COMMONWEALTH vs. MAC HUDSON.

Suffolk. March 7, 2006. - May 16, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Assistance of counsel, New trial. *Witness,* Impeachment. *Evidence,* Impeachment of credibility, Prior inconsistent statement, Failure to produce witness, Alibi, Exculpatory.

A Superior Court judge hearing a criminal defendant's motion for a new (third) trial did not abuse his discretion in determining that defense counsel had not rendered ineffective assistance by declining to introduce, at the defendant's second trial, an affidavit in which the Commonwealth's primary identification witness purported to recant the testimony he had given at the defendant's first trial, where the evidence warranted the judge's finding that defense counsel's strategy not to use the affidavit was not manifestly unreasonable, given concerns about the effect of the Commonwealth's potential rebuttal evidence had the affidavit been used; the weakness of the Commonwealth's case at the second trial, in which the recorded testimony of the witness, who refused to testify, was read in evidence; the fact that defense counsel impeached the recorded testimony of the witness in other ways; and the credibility problems of the Commonwealth's remaining identification witnesses [714-722]; moreover, the judge's finding that defense counsel had another valid basis for not introducing the affidavit (namely, that the state of the law at the time of the second trial did not permit impeachment of a witness's recorded testimony by a prior inconsistent statement), although erroneous, did not change the conclusion that defense counsel had not rendered ineffective assistance [722-723].

Where a criminal defendant failed to demonstrate that his counsel's decision not to call certain witnesses at trial was manifestly unreasonable [723-724], or that counsel's failure to provide timely notice to the Commonwealth of a proposed trial witness likely deprived the defendant of an otherwise available, substantial ground of defense [724-726], counsel's failure to raise those points on the defendant's direct appeal could not constitute ineffective assistance [726-727].

A criminal defendant failed to demonstrate that the Commonwealth had withheld exculpatory evidence at trial. [727-728]

INDICTMENTS found and returned in the Superior Court Department on August 11, 1989.

A motion for a third new trial, filed on July 13, 2001, was heard by *Peter M. Lauriat*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

*Greg T. Schubert* for the defendant.

COWIN, J. This case arises from the second trial of the defendant, Mac Hudson, in which he was convicted of murder in the second degree and other crimes.[1] We granted the Commonwealth's application for further appellate review of a decision of the Superior Court denying the defendant a new (third) trial on these charges. The Appeals Court reversed and ordered a new trial. *Commonwealth* v. *Hudson*, 63 Mass. App. Ct. 1113 (2005) (unpublished memorandum and order). The basis for the Appeals Court decision was its conclusion that defense counsel provided ineffective assistance at Hudson's second trial by failing to introduce an affidavit in which a Commonwealth witness, Keil Kimbrough, purported to recant the testimony he had given at Hudson's first trial. The Appeals Court held that defense counsel's failure to use that affidavit (recantation affidavit) to impeach Kimbrough's prior recorded testimony was manifestly unreasonable and that the motion judge erred in concluding that the attorney was not ineffective.[2] We conclude that the motion judge was correct in his finding on this issue (and the others raised by the defendant, see note 2, *supra*), and affirm the order denying the motion for a new trial.

1. *Background.* The defendant was originally tried in 1990, and, in 1994, his convictions were reversed by the Appeals

---

[1] The defendant was indicted on a charge of murder in the first degree, but was convicted of murder in the second degree at his first trial. See *Commonwealth* v. *Hudson*, 36 Mass. App. Ct. 1115 (1994). At that time, he was also convicted of assault and battery by means of a dangerous weapon, armed assault with intent to murder, armed assault with intent to rob, and illegal possession of a firearm. He was convicted of the same offenses in his second trial.

[2] The defendant claimed his attorney was ineffective in other respects as well. In view of its decision that the handling of the recantation affidavit constituted ineffective assistance, the Appeals Court did not reach the other grounds.

Court on the ground that he had been denied an impartial jury. *Commonwealth* v. *Hudson*, 36 Mass. App. Ct. 1115 (1994). We denied further appellate review. *Commonwealth* v. *Hudson*, 418 Mass. 1106 (1994). In 1997, the defendant was retried before a jury and, as stated, was once more convicted of the same charges. The Appeals Court affirmed his convictions on direct appeal. *Commonwealth* v. *Hudson*, 49 Mass. App. Ct. 1118 (2000). Further appellate review was denied by this court.[3] *Commonwealth* v. *Hudson*, 432 Mass. 1107 (2000). The trial judge denied the defendant's subsequent motion for a new trial without an evidentiary hearing. That denial of the motion for a new trial was appealed and a panel of the Appeals Court issued an order retaining jurisdiction, but remanding the matter to the Superior Court for an evidentiary hearing. As the trial judge had retired, the matter was assigned to a different judge, whom we shall designate the motion judge.

The motion judge held a hearing at which the only witness was defense counsel. The attorney had represented the defendant on his (successful) first appeal, at his second trial, and on direct appeal after the second trial. (We refer to him as defense counsel or counsel.) A third attorney represented the defendant on his most recent motion for a new trial. The motion judge found that it was not manifestly unreasonable for defense counsel not to use the recantation affidavit at the second trial. The motion judge also resolved the defendant's other claims unfavorably to the defendant and concluded that defense counsel had not been ineffective. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

The Appeals Court initially affirmed the denial of the motion for a new trial without further briefing. *Commonwealth* v. *Hud-*

---

[3] A codefendant, Charles Hughes, also known as Chuck Goforth, was indicted on the same charges as the defendant, tried with the defendant at the original trial, and convicted of the same offenses as the defendant. The appellate proceedings involving Hughes after the first trial were the same as those concerning the defendant. Hughes was tried as a codefendant in the second trial and was again convicted of all charges. He has not joined in this motion for a new trial.

A third codefendant, Terry Carter, allegedly the driver of the automobile that brought Hughes and Hudson to the scene, was also tried at the original trial. He was acquitted.

*son*, 61 Mass. App. Ct. 1118 (2004) (unpublished memorandum and order). The defendant petitioned for rehearing claiming that the motion judge's factual findings were not supported by the record. The Appeals Court "agree[d]" with the defendant, vacated its earlier order affirming the denial of the motion for a new trial, reversed the judgments, set aside the verdicts, and remanded the matter to the Superior Court for a new trial. The Commonwealth filed a petition for rehearing, which was denied, and the instant application followed.

We briefly recite the evidence at the defendant's first trial, an event that occurred between the first and second trials, and the evidence at the second trial. We leave further details of the evidence at the second trial to a later discussion of the issues.

This case involves a shooting in the Roxbury section of Boston on April 22, 1989. Derek Twitty was shot to death while selling heroin. One of his friends, Marc Jones, was also shot, but survived the attack.

At the first trial, Keil Kimbrough was the primary witness against the defendant. He testified that the defendant and Hughes, the codefendant, were the shooters. Kimbrough had known both of the defendants for about four years. He testified that, on the day in question, he left his aunt's house at 595 Dudley Street in the afternoon and proceeded to a nearby corner where he witnessed the shooting of Twitty and Jones. At the Roxbury District Court two days later, Kimbrough informed the police that he had witnessed the shooting. Kimbrough was then taken to a police station, interviewed further and shown approximately 300 photographs. He identified those of Hughes and the defendant as the shooters.

There was additional eyewitness testimony from two bystanders, Dwayne Moody and Larry Brown, as well as Jones, the second victim who survived the shooting. Dwayne Moody identified the defendant at trial as the shooter. He testified that the defendant had a distinguishing birthmark on the left side of his face that looked like a "burn mark" or a "mole" and that he had previously selected a photograph of the shooter from a photographic array that showed that facial scar (Moody also selected a photograph of Hughes). Moody was impeached by evidence that he had not been able to identify Hudson at a

preliminary hearing one week earlier, but Moody responded that his failure to make an identification at that time occurred because the defendant was wearing glasses that covered the distinctive mark. Larry Brown, another bystander, stated that he was present at the shooting and did not recognize the defendant. He was not asked to identify Hudson. Jones, the surviving victim, testified at trial that he was interviewed in a hospital one hour after the attack when he did not know whether he would live. He described the assailants to Boston police detectives and, two days later, he selected photographs of the defendant and Hughes as the shooters. Jones identified Hughes as one of the assailants although he said he did not see his face at the time of the shooting. As to the defendant, he said he "wasn't sure," but the photograph he had chosen was a person who "looked like" the defendant. He "[could not] say" that the defendant was the second assailant. Of all the eyewitnesses, Kimbrough was the only one who knew the defendant. He was cross-examined extensively as will be detailed below. No forensic evidence connected the defendant to the crime.

After the defendant's 1990 convictions, Kimbrough, while incarcerated, signed the recantation affidavit. He averred that he had not been present at the shooting and that a police officer had instructed him how to testify. He stated that he had lied about witnessing the events to obtain "consideration" for pending criminal cases.

At the defendant's second trial, in 1997, Kimbrough was again called as a Commonwealth witness. He answered a few preliminary questions, and then stated before the jury that he did not want to testify and asked for a lawyer. The jury were excused, an attorney was appointed, and, after a lobby conference, the trial judge, concluding that Kimbrough had "some risk" of a perjury prosecution, permitted him (in the absence of the jury) to assert his privilege under the Fifth Amendment to the United States Constitution not to testify. During a colloquy regarding Kimbrough's assertion of his Fifth Amendment privilege, the judge recounted some background information including the fact that he had been informed "in an unrecorded lobby conference with all counsel being present" that the Commonwealth had interviewed Kimbrough "to the effect that the

[recantation] affidavit had been obtained by duress, when fellow prisoners visited Mr. Kimbrough in his cell."

The judge ruled that Kimbrough was an unavailable witness (without telling the jury the reason for his unavailability) and, over the objection of the defendant and Hughes, permitted Kimbrough's entire testimony from the first trial to be read to the jury. Defense counsel, in possession of Kimbrough's recantation affidavit, did not use that affidavit to impeach Kimbrough's testimony. Again, no forensic evidence linked the defendant to the shooting and, by the time of this trial, some physical evidence had been lost. The defense theory was essentially that the Commonwealth witnesses were criminals and drug users whose testimony was not credible.

2. *Discussion.* a. *Recantation affidavit.* As stated earlier, the Appeals Court ordered a new trial because of the failure of counsel at the second trial to impeach Kimbrough's recorded testimony with his recantation affidavit. The motion judge had concluded that the trial attorney had no memory of his reason for not impeaching with the recantation affidavit, but that "it is . . . reasonable to assume that [counsel] was concerned about the [Commonwealth's] likely rebuttal evidence that would . . . show that Kimbrough's affidavit had been provided under duress [i.e., when fellow inmates visited Kimbrough in his cell]." The motion judge also determined that defense counsel may not have used the affidavit because of a concern that the state of the law at the time did not permit impeachment of recorded testimony by introduction of a prior inconsistent statement. But see *Commonwealth* v. *Mahar*, 430 Mass. 643, 649 (2000); *Commonwealth* v. *Sellon*, 380 Mass. 220, 224 n.6 (1980), and discussion *infra*. We review the motion judge's conclusion that trial counsel did not render ineffective assistance to determine whether there has been an abuse of discretion or other error of law. "When, as here, the motion judge did not preside at trial, we defer to that judge's assessment of the credibility of witnesses at the hearing on the new trial motion, but we regard ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

On a motion for a new trial, the burden of establishing the

grounds for a new trial rests on the defendant. *Commonwealth v. Comita*, 441 Mass. 86, 93 (2004). In order to prevail on his claim of ineffectiveness of counsel, the defendant must show that (1) counsel's conduct fell measurably below that which might be expected from an ordinary fallible lawyer; and (2) that this conduct likely deprived the defendant of an otherwise available, substantial ground of defense. *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). "Where, as here, the claim is that defense counsel committed a tactical error, the defendant must demonstrate that defense counsel's tactical judgment was manifestly unreasonable." *Commonwealth v. Finstein*, 426 Mass. 200, 203 (1997). The burden to prove ineffective assistance remains on the defendant even if memories have faded and rendered his task more difficult. *Commonwealth v. Comita, supra* at 93-94.

"In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance." *Commonwealth v. Bart B.*, 424 Mass. 911, 916 (1997). "Even on the more favorable standard of review under [G. L. c. 278,] § 33E [which is not applicable here], a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference. . . . Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." (Footnote omitted.) *Commonwealth v. Fisher*, 433 Mass. 340, 357 (2001) (counsel not ineffective in failing to impeach witness with certain prior inconsistent statements where witness was extensively impeached by other means). Defense counsel has not drawn our attention to any case in which this court has held that failure to use a particular method of impeachment constituted ineffective assistance of counsel.

We conclude that the motion judge did not abuse his discretion in determining that failure to use the recantation affidavit did not constitute ineffective assistance of counsel. At issue here is a strategic choice, and the question is whether that

strategic choice was "manifestly unreasonable." "An attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998), citing *Commonwealth* v. *Roberts,* 423 Mass. 17, 20 (1996). *Commonwealth* v. *White,* 409 Mass. 266, 272 (1991) ("In cases where tactical or strategic decisions of the defendant's counsel are at issue, we conduct our review with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful"). The motion judge concluded that "it is . . . reasonable to assume" that the attorney was concerned about the effect of the Commonwealth's rebuttal evidence, i.e., that the affidavit was not used because the Commonwealth possessed evidence to demonstrate that it was false. He further concluded that this strategy was not manifestly unreasonable. That finding was warranted by the evidence.

We have reviewed the transcript of the hearing on the motion for a new trial, and it is clear that trial counsel had no memory of the specific reason for his decision not to use the affidavit ("I don't remember the details of this decision, I just don't . . . I simply don't remember . . .").[4] Counsel did, however, acknowledge that, he "should have been aware" that had he introduced Kimbrough's recantation affidavit, the Commonwealth "could come back" with the testimony of Detective Thomas to rebut the recantation:

> *Q.:* "And having read that portion of the trial transcript that dealt with Mr. Kimbrough, would you agree with me that there was a potential pitfall had you introduced the recantation of Keil Kimbrough, potential pitfall?"

> *A.:* "Well, the judge says on the record about an unrecorded lobby conference that I don't recall, that the Commonwealth was maintaining at the unrecorded lobby conference that Kimbrough had told somebody at some point in time he did this because he was pressured into it."

---

[4] Counsel's failure of memory is not surprising. At the time of the motion hearing, he had tried approximately fifty murder cases, and he was being asked the reason for a strategic decision made seven years earlier.

"    . . . .

*Q.*: "So you were aware, sir, that had you introduced the recantation, there would be grounds in the Court's discretion . . . whether to get into an explanation as to the recantation of Keil Kimbrough . . . ?"

*A.*: "It's very hard to reconstruct thinking that I don't have a memory of, but reading that portion of the [trial] transcript,[5] I should have been aware at the time that if I introduce something about Mr. Kimbrough there was a possibility the Commonwealth could come back with [Detective] Thomas and say, 'No, Kimbrough told us this story when we saw him after his so-called recantation.' "

"    . . . .

*Q.*: "[T]here was information known to you that the Commonwealth's theory . . . was that this affidavit was obtained under duress of Keil Kimbrough?"

*A.*: "After reading the transcript, yes."

*Q.*: "Do you have a recollection if that was known to you at the time?"

*A.*: "Well, it must have been, because I read the transcript, but I don't have a specific memory of that. It would shock me if the Commonwealth wasn't able to produce some kind of evidence along those lines. . . . [S]o while I have no specific memory of this, it's there in the transcript, I must have known it at the time. Assuming he lied in the affidavit, then it would not surprise me that when he talked to the Commonwealth, because he had only done this under duress, that he had said, I only did it under duress, so my assumption would be in either case that the Commonwealth — it would be surprising . . . if the Commonwealth couldn't produce some evidence that

---

[5]The reference is to that portion of the transcript that details the conference at trial concerning Kimbrough's assertion of his Fifth Amendment privilege. It was at that conference that the judge stated that the Commonwealth had interviewed Kimbrough "to the effect that the [recantation] affidavit had been obtained by duress."

he was claiming he was under duress when he filed that affidavit."

The defendant takes a different view of the attorney's statements at the hearing on the motion for a new trial. He argues, and the Appeals Court agreed, that it was "clear from the attorney's own testimony that he had determined that the significance of the affidavit to the defense was far greater than the risk of any potential adverse evidence of duress." The defendant bases this contention on the attorney's statement that he could not "conceive of having [Kimbrough] on the witness stand and not going after him with this affidavit no matter what the Commonwealth was going to come back and say."

This reasoning misinterprets the attorney's testimony in two respects. First, it ignores numerous statements that he could not remember why he chose not to use the affidavit. The motion judge could properly determine that those statements outweighed the attorney's other testimony. In addition, the defendant overlooks a crucial part of the attorney's testimony. The attorney stated that he "could not conceive of having [Kimbrough] *on the witness stand* and not [using the recantation] affidavit" (emphasis supplied). The attorney, well versed in trial tactics and the meaning of different trial terms, predicated his use of the affidavit on having a live witness on the stand. He did so every time that he mentioned that he believed he would have used the affidavit ("[had Kimbrough] *actually testified at the trial,* . . . I would have definitely flashed [the recantation affidavit] to him no matter what the circumstances of obtaining [it] . . . I can't imagine not *confronting him live on the witness stand* with a signed affidavit. . . . I can't conceive of having this affidavit, hearing Keil Kimbrough *testify live,* like his recorded testimony and not going after him with this. Why I didn't go after him when it was just recorded testimony, I can't recall." [Emphasis supplied.])

The fact that the attorney repeated the qualification of a "live witness" every time that he mentioned the subject emphasizes that it was no careless slip of the tongue. Rather, the distinction is one that is important, and it supports the motion judge's determination that counsel's strategy was not manifestly

unreasonable. The distinction the attorney made permits the reasonable inference that he considered the Commonwealth's evidence to be as weak as possible. Given the paper testimony of the Commonwealth's main witness, that witness's refusal to testify, his criminal record and the cross-examination from the first trial, counsel could reasonably have concluded that the situation was as good for the defendant as it was likely to be. Were it otherwise, i.e., had Kimbrough testified in person, counsel's assessment of the situation would have been different. In that case, the Commonwealth would have had a "live" witness, and the jury would not have heard the witness refuse to testify. Counsel could then have concluded rationally that the Commonwealth's case was stronger and that he should use the recantation affidavit to impeach the testifying witness. In the actual case, the difference between a live witness and paper testimony was a significant part of his strategy, and the assessment that the risks of using the recantation affidavit outweighed its impeachment value is entirely reasonable.

The trial transcript also supports the motion judge's conclusion that defense counsel was not ineffective. Although defense counsel did not use Kimbrough's recantation affidavit, Kimbrough was impeached in other ways. The entire cross-examination from the first trial was read into the record. In that cross-examination, Kimbrough conceded that he had previously sold heroin in the location of the shooting, that he delayed reporting the crime for two days, that he was at the Roxbury District Court two days later on his own pending criminal case, that he had been charged with an additional crime since then, was currently on probation, and that he had used an alias on one occasion when arrested. Kimbrough agreed that he "knew how the game was played," had "hopes" or "expectations" of "help . . . with [his] cases," but insisted that he was promised nothing for his testimony. Defense counsel did not limit the impeachment of Kimbrough to the prior cross-examination. After the reading of Kimbrough's prior testimony, Hughes's counsel and defendant's counsel read into the record the extensive list of Kimbrough's prior convictions and pending cases. He was impeached with prior convictions of breaking and entering in the daytime, breaking and entering in the night-

time, carrying a dangerous weapon, assault and battery on a police officer, possession of a Class A substance with intent to distribute, malicious destruction of property, and larceny from the person. The charges that were pending against him at the time he first spoke to the police were also read to the jury.

Accordingly, the Commonwealth's principal witness against the defendant was presented as a drug dealer with a considerable number of prior convictions. He had refused to testify in front of the jury, leaving the Commonwealth with only paper testimony from its primary identification witness. It is a reasonable inference that defense counsel made a tactical decision to leave it at that.[6] Defense counsel well knew that introduction of the recantation affidavit could have opened the door for Detective Miller Thomas to testify that Kimbrough had admitted to him that the recantation affidavit was obtained through duress and was false. Counsel also had no idea what other testimony Detective Thomas might recount. In such circumstances, the testimony of Detective Thomas would serve only to strengthen Kimbrough's identification of the defendant as the shooter given at the first trial. Avoiding the risk of this police testimony was a reasonable decision. There was a quintessential strategic choice to be made: whether the defendant was in a better position with the paper testimony of an admitted criminal and drug dealer, an inherently noncredible witness, who faced pending criminal charges when he first spoke to the police about the present case, who had refused to testify in front of the jury, who had been effectively cross-examined at the first trial and who, at the second trial, was impeached by further convictions; or whether impeachment of the witness by an affidavit itself subject to rebuttal by a live Commonwealth witness (a police officer) would be more convincing. We cannot say that it was manifestly unreasonable for defense counsel to determine that Kimbrough had been sufficiently damaged and that introduction of the recantation affidavit would present a significant risk. Counsel's judgment was not "so manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.' " *Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

---

[6]Because the motion judge did not preside at the trial, we are in as good a position as he to assess the trial record. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986).

The testimony of the other Commonwealth identification witnesses supports our view that counsel made a reasonable tactical determination to avoid use of the recantation affidavit. At the second trial, the same identification witnesses testified as at the first trial: Jones, the surviving victim; and the two bystanders, Moody and Brown.[7] Each of these three witnesses was subjected to extensive cross-examination by defense counsel. The jury learned that they all were drug dealers or users, and all had criminal records. Each gave testimony that was inconsistent in varying respects with the testimony at the first trial. We need not detail the inconsistencies here. Suffice it to say that their identification testimony was severely impeached and that one, Brown, surprised everyone by saying he had identified the defendant at the first trial. The prosecutor stipulated that this was not the case and, on cross-examination, Brown admitted he had not identified Hudson at the first trial. Thus, as the case progressed, defense counsel could reasonably assess the Commonwealth's case as follows: Kimbrough had been damaged by the prior cross-examination and impeached by prior convictions; there was a general lack of credibility of the entire array of Commonwealth witnesses; no forensic evidence tied the defendant to the crime; and various items of physical evidence had been lost before the second trial. Defense counsel reasonably could have determined that the value of impeaching Kimbrough when the jury were already aware of all the credibility problems of the Commonwealth witnesses was outweighed by the risk associated with testimony by a police officer that Kimbrough had disavowed the recantation affidavit. Such evidence could destroy the defendant's chances of an acquittal. It was a reasonable cost-benefit assessment.

The defendant also contends that the damage to the defendant "was increased" by trial counsel's failure to call Hughes's private investigator to testify (a) that Kimbrough's aunt was not living at the Dudley Street address (where Kimbrough had testi-

---

[7] These witnesses testified after Kimbrough's testimony was read to the jury. We discuss it here because a decision whether to use the recantation affidavit would take into account the anticipated testimony, including cross-examination of the other Commonwealth witnesses. In addition, the defense could have sought to introduce the recantation affidavit at a later point in the trial, even after Kimbrough's testimony.

fied he visited her) and (b) that Kimbrough had told the investigator that he had committed perjury at the defendant's first trial. The defendant claims that "[t]hese omissions," together with Detective Thomas's testimony that Kimbrough was uneasy during Thomas's interview,[8] "allowed the jury to infer that Kimbrough's sudden unavailability [at the second trial] may have been caused by his fear of [the defendants]," and that this was "highly prejudicial." The jury's interpretation of Kimbrough's "sudden unavailability" is unknown and something on which one can only speculate. Defense counsel's assessment of the jury's reaction to Kimbrough's unavailability was an additional factor to be weighed in his decision whether to impeach a paper witness with a recantation that could be rebutted by a live witness. We cannot say that his choice in this regard was manifestly unreasonable.

The motion judge also found that trial counsel may not have used the affidavit because of concern that the state of the law did not permit impeachment of a witness's recorded testimony by a prior inconsistent statement. The judge concluded that this was also a valid basis for failing to introduce the affidavit. He stated that the law on impeachment of the testimony of a witness testifying by prior recorded testimony was not clear at that time. This was error.

As the Appeals Court stated, it was "established long before" the defendant's second trial that a witness whose testimony is offered in the form of prior recorded testimony may be impeached by a prior inconsistent statement. In its decision, the Appeals Court cited *Commonwealth* v. *Sellon,* 380 Mass. 220, 224 n.6 (1980) ("Where an exception to the hearsay rule allows the admission of a statement by an out-of-court declarant, this statement is subject 'to impeachment in the appropriate ways,' quoting 3A J. Wigmore, Evidence § 884 [Chadbourn rev. ed. 1970]"). The Appeals Court noted that the rule was also set forth in 1994, in P.J. Liacos, M.S. Brodin, & M. Avery, Mas-

---

[8]Boston Detective Miller Thomas had testified that Kimbrough was "very reluctant, very uneasy" when Thomas interviewed him in "boot camp" at the Old Colony Correctional Center in 1996. Kimbrough had reported to Thomas that his recantation affidavit had been obtained by duress. As matters stood, Thomas was not permitted to testify to the latter.

sachusetts Evidence § 8.4.3, at 448 (6th ed. 1994) (impeachment by prior inconsistent statement of hearsay declarant "essentially consistent with common practice") and was included in Proposed Mass. R. Evid. 806. The law was certain; the fact that this court did not definitively adopt the proposed rule until 2000, see *Commonwealth* v. *Mahar*, 430 Mass. 643, 649 (2000), does not indicate otherwise. That said, however, neither the motion judge's nor defense counsel's view, whatever it may have been, of the law on the subject changes our conclusion. The fact that evidence is admissible does not mean that it is of necessity desirable that it in fact be introduced. For the reasons stated, counsel's decision not to introduce the affidavit was not "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

b. *Other claims.* Because the Appeals Court reversed the defendant's convictions for failure of trial counsel to use the recantation affidavit, it did not consider the defendant's other claims of ineffective assistance. Because we have concluded that failure to use the recantation affidavit was not manifestly unreasonable, we proceed to discuss the other claims relative to ineffective assistance. The defendant contends that his trial counsel was ineffective for not calling as witnesses four men who had prepared affidavits containing allegations that conflicted with the testimony of the Commonwealth's eyewitnesses. These affidavits state essentially that the Commonwealth's witnesses had told them that they were not present at the shooting, could not see the shooters, or that Kimbrough had told them that he had testified falsely at the first trial. The judge concluded that counsel's decision not to call these men as witnesses was not manifestly unreasonable. According to the motion judge, each of the men had prior criminal convictions, and each was serving a prison sentence at the time of the second trial. In addition, the defendant had procured their affidavits while he and they were all incarcerated. As the motion judge stated, "The jury could well have viewed [the defendant's] actions as a concerted effort . . . to create or manufacture impeachment evidence." The judge's decision is supported by the evidence. We observe in addition that use of these witnesses

by the defense would have been entirely inconsistent with the defense theory that the Commonwealth's case was not credible because of its reliance on the testimony of convicts and drug addicts.[9,10]

The defendant also claims ineffective assistance of counsel from trial counsel's failure to provide timely notice to the Commonwealth of a proposed alibi witness. Several years after the shooting incident, the defendant informed his trial counsel that his girl friend could testify as an alibi witness. Counsel then included her on his witness list for the second trial but, contrary to Mass. R. Crim. P. 14 (b) (1), 378 Mass. 874 (1979), did not notify the Commonwealth that she was an alibi witness until several days after the trial had started. As sanction for this late disclosure, the trial judge excluded the alibi testimony pursuant to rule (b) (1) (D).[11]

The motion judge concluded that counsel was "uncertain before trial whether [the] alibi testimony would be necessary or even helpful" and that counsel's decision not to notify the Commonwealth timely of his intent to call the alibi witness was not "serious incompetency, inefficiency, or inattention of counsel." The judge's conclusion is not supported by the evidence. Defense counsel testified at the motion hearing that he remembered the scenario regarding the alibi witness. He recalled that he had represented to the trial judge that he was

---

[9]This case is not one where defense counsel was unaware of the affidavits of the other witnesses. Contrast *Commonwealth* v. *Berrios*, 64 Mass. App. Ct. 541, 547-551 (2005) (counsel failed to learn after defendant had pleaded guilty that key witness had changed his testimony after testifying at grand jury and had testified in another case so as not to incriminate defendant). These men were named as witnesses by the judge during jury empanelment and apparently were available to be brought into court from the institutions where they were serving their sentences. The inference is clear that defense counsel was deciding how to proceed by assessing the value of their testimony as the trial progressed.

[10]In his brief, the defendant claims there was a fifth witness, Kenneth Bodden, who had signed an affidavit concerning the shooting. No evidence was presented concerning Bodden at the motion hearing. Accordingly, the motion judge did not address the contention. As we have stated, the defendant bears the burden of establishing the grounds for a new trial. *Commonwealth* v. *Comita*, 441 Mass. 86, 93 (2004). Based on the argument concerning Bodden, evidence of the existence of an affidavit from Bodden would not affect our decision.

[11]It is not contended that timely disclosure was not required.

not obligated to disclose the alibi witness because he had not signed a pretrial conference report binding him to do so. See Mass. R. Crim. P. 14 (b) (1) (A). He was then shown such a report with his signature on it.[12] Assuming that sequence of events to be true, it was negligent for defense counsel to be unaware of his discovery obligations, and his negligence caused the alibi witness to be barred from testifying. Thus, defense counsel's actions in regard to the alibi witness fell "measurably below" that which is expected from an ordinary fallible lawyer.[13]

The motion judge concluded that counsel was not ineffective in regard to the alibi witness because he was "uncertain before trial whether [she] . . . would be necessary or even helpful." The judge found that the decision to delay notifying the Commonwealth was "tactical and purposeful." That decision by counsel, however, was informed by counsel's belief (according to his own testimony) that he was not bound to reveal the existence of an alibi witness. His belief was incorrect; thus, if the decision was a tactical one, it was based on misinformation.

The defendant must also establish, however, that the failure of counsel "likely deprived [him] of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). This he has not done. The defendant has not informed this court of the precise contours of the alibi witness's testimony. Nevertheless, there is obvious weakness in any alibi testimony of a defendant's girl friend. See *Commonwealth* v. *Grace*, 370 Mass. 746, 752 (1976), quoting *Commonwealth* v. *Stout*, 356 Mass. 237, 243 (1969) (claims by defendant's friends "likely to be untrustworthy"). The inherent weakness of such testimony would be exacerbated by the fact that it was not revealed for several years during which time her boy friend languished in State prison serving a life sentence.

---

[12]Counsel testified that, contrary to the rest of the trial proceeding, he had a clear memory of this event because "it was very embarrassing" to be caught in a misrepresentation to the judge.

[13]On the direct appeal after the second trial, in its unpublished memorandum and decision, the Appeals Court held that the trial judge did not err in excluding the witness and stated that defense counsel "should have disclosed the alibi defense when there was a reasonable possibility that it might be used, not when the decision . . . became firm."

These factors render her testimony virtually useless.[14] In these circumstances, the defendant has not satisfied his burden of establishing that the substandard performance of counsel deprived him of a substantial ground of defense.[15] Although we differ from the motion judge with respect to the performance of counsel, we conclude, as did he, that there was no ineffective assistance of counsel from the failure to provide timely notice of the alibi witness.

As stated earlier, the judge who presided over the second trial initially denied the motion for a new trial. Although he did not hold an evidentiary hearing, he did write a memorandum and order on the defendant's motion. While that judge's views do not enter into our assessment of the motion judge's decision, we think it useful to recite the description of counsel's trial performance by the jurist who was in the best position to evaluate how the trial was conducted:

> "[Counsel's] conduct in behalf of [the defendant] in this case was a hallmark performance of careful preparation and knowledge of the evidence in the case. [He] made well prepared and articulately delivered opening and closing statements. He engaged in zealous and aggressive cross examination of the Commonwealth's identification witnesses. . . . [Defense counsel] ought to be commended for conducting a spirited and able defense of [the defendant] in a most difficult factual situation."

The defendant argues also that he received ineffective assistance from defense counsel when he served as counsel in the original appeal. This issue was not addressed by the motion judge. It was, however, raised in the defendant's motion for a new trial and in his memorandum in support of that motion. It

[14]The codefendant Hughes offered an alibi witness, his sister-in-law, who testified that Hughes was visiting her and her newborn infant in a hospital at the time of the shooting. She admitted on cross-examination that she had not revealed this information until years later. Hughes was convicted, indicating that the jury rejected the sister-in-law's testimony.

[15]We do not endorse violations of the rule requiring timely notice of alibi. See Mass. R. Crim. P. 14 (b) (1), 378 Mass. 874 (1979). See also Mass. R. Crim. P. 14 (b) (1), as appearing in 442 Mass. 1518 (2004). We address here only the issue of ineffective assistance of counsel concerning the alibi witness in the circumstances of this case.

has also been included in his appellate briefs. We therefore consider the claim. The defendant's specific assertion is that counsel, while representing the defendant on his direct appeal after his second trial, was not aware of his own error at trial in failing to notify the Commonwealth of the defendant's alibi witness. He argued instead that the trial judge denied the defendant due process of law by excluding the alibi witness. This failure allegedly deprived the defendant of "relief from the prejudice resulting from trial counsel's incompetence." In addition, the defendant claims that counsel, while acting as appellate counsel, did not raise the fact that he failed effectively to impeach key witnesses against the defendant.

The defendant's propositions are without merit. Given that we have concluded that the manner in which counsel conducted the trial was not ineffective, his failure to raise these points on appeal cannot constitute ineffective assistance because the arguments would have been of no avail. See *Commonwealth* v. *Balliro*, 437 Mass. 163, 169 (2002) (appellate counsel cannot be ineffective for failing to challenge trial counsel's effectiveness if trial counsel was effective). In addition, the issue is moot. New appellate counsel has raised these issues and they have all been decided adversely to the defendant.

The defendant raises one claim that does not relate to ineffective assistance of counsel. He maintains that the Commonwealth withheld exculpatory evidence regarding Kimbrough's recantation before the second trial. Although this issue was argued in the defendant's memorandum in support of his motion for a new trial and evidence was presented on the question at the motion hearing, the motion judge did not rule on the issue.[16] As the defendant has raised the issue in his briefs before the Appeals Court and before this court, we do address it. "To prevail on this point [withholding of exculpatory evidence], the defendant must establish that the evidence existed, that it tended to exculpate him, and that the prosecution failed to deliver the information." *Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995). The evidence adduced at the hearing makes clear that the defendant has failed to meet this standard.

---

[16]This issue had been thoroughly discussed by the trial judge in his decision on the defendant's motion for a new trial.

The defendant's specific claim is that the Commonwealth withheld letters from Kimbrough to one Derek Tyler in which Kimbrough stated that he testified falsely at the first trial. Tyler prepared an affidavit in which he claimed to have forwarded copies of these letters from Kimbrough to "the A.D.A.'s office" in March, 1996. Based on the testimony at the motion hearing, there was no evidence that the letters even existed.[17] In any event, all the letters indicated was that Kimbrough had recanted his testimony at the first trial. All parties were well aware of this fact by the time of the second trial and counsel so stated in his testimony at the hearing on the motion for a new trial.

For all of the foregoing reasons, the motion for a new trial was properly denied. The Superior Court judge's order denying the motion for a new trial is affirmed.

*So ordered.*

---

[17]In his decision on the motion for a new trial, the trial judge stated that "Kimbrough's letters to Tyler and a copy of the letter allegedly sent by Tyler to the District Attorney have never been produced. Hudson's claim in this regard is supported only by an affidavit sworn to by Tyler. The district attorney has searched his file in vain for the alleged Tyler letter. . . . None of the *Schand* [*Commonwealth* v. *Schand*, 420 Mass. 783, 787 (1995)] factors are present here. Hudson's contentions on this issue are meritless."