Commonwealth v. Smith.

## COMMONWEALTH vs. THOMAS SMITH.

Bristol. December 10, 2009. - April 9, 2010.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Assistance of counsel, Argument by prosecutor. *Constitutional Law,* Admissions and confessions, Voluntariness of statement, Assistance of counsel. *Evidence,* Admissions and confessions, Voluntariness of statement, Relevancy and materiality.

A Superior Court judge, in ruling on a criminal defendant's pretrial motions to suppress, did not err in concluding that the defendant was not in custody when he made certain statements to the police while at a State prison, where there was no indication in the record that the defendant was subject to some coercion beyond that inherent in ordinary prison life; accordingly, no Miranda rights were implicated in the process, and there was thus no meaningful question whether any of the defendant's rights were voluntarily waived. [478-480]

A criminal defendant failed to demonstrate that his trial attorney's failure to call him to testify deprived him of his constitutional right to testify in his own defense. [480-481]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from defense counsel's strategic decision not to call a certain witness [481-482]; further, counsel's failure to call a particular witness to testify regarding alleged payments made to two Commonwealth witnesses was not manifestly unreasonable, where counsel, by preparing a stipulation to the jury, generally succeeded in placing before them the evidence necessary for them to consider that the witnesses could have been influenced improperly [482-484]; finally, counsel's strategic decisions not to impeach an eyewitness, not to object to the use of leading questions, and to advise the defendant to waive his right to testify were not manifestly unreasonable [484-486].

At a murder trial, the judge did not abuse his discretion in denying the defendant's motion for a mistrial, brought on the ground that Commonwealth improperly delayed disclosure of financial and other assistance to a witness, where there was no indication that the delay prejudiced the defense. [486]

At a criminal trial, the contradictory testimony of one witness was a matter of credibility for the jury to decide, and did not create a substantial likelihood of a miscarriage of justice. [486]

At a murder trial, a statement in the prosecutor's closing argument was a fair inference from the evidence and did not mislead the jury on the issue of premeditation by suggesting that the defendant armed himself for the purpose of killing the victim. [487]

At a murder trial, the judge did not err in instructing the jury that one may infer an intent to kill from the use of a firearm. [487-488]

INDICTMENTS found and returned in the Superior Court Department on June 30, 2005.

Pretrial motions to suppress evidence were heard by *Robert J. Kane*, J.; the cases were tried before *Richard T. Moses*, J., and a motion for a new trial, filed on January 31, 2008, was considered by him.

*Richard J. Shea* for the defendant.

*David J. Gold*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury in the Superior Court of murder in the first degree on a theory of deliberate premeditation. He was also convicted of unlawful possession of a firearm and unlawfully discharging a firearm within 500 feet of a dwelling. The defendant appeals from certain of his convictions[1] and from the denial of his motion for a new trial. On appeal, counsel for the defendant claims that the defendant's motions to suppress his statements to the police should have been allowed because he did not waive his Miranda rights and his statements were not made voluntarily. The defendant's appellate counsel also asserts that, at trial, the defendant was deprived of his right to testify; his trial counsel was ineffective in several respects; the Commonwealth improperly delayed disclosure of financial and other assistance to a witness; contradictory testimony of one witness created a substantial likelihood of a miscarriage of justice; the prosecutor's closing argument was improper; and the judge erred in instructing the jury that malice may be inferred from the use of a dangerous weapon. The defendant also makes several claims on his own behalf, and counsel has not associated himself with them. See *Commonwealth* v. *Moffett*, 383 Mass. 201 (1981). We reject the defendant's claims, affirm his convictions, and, after review of the entire record pursuant to our responsibility under G. L. c. 278, § 33E, decline to exercise our power to grant extraordinary relief.

1. *Facts.* We briefly recite the facts the jury could have found, leaving most of the evidence for discussion in connection with the specific issues raised. During the early morning of January 13, 2005, Arthur Simpson was shot in the DeWert housing

---

[1]The conviction of unlawfully discharging a firearm within 500 feet of a dwelling was placed on file with the defendant's consent and is not before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

project in Taunton. He ran to a nearby house seeking aid, collapsed on the stairs leading to the house, and died shortly thereafter. The cause of death was a single gunshot wound. The Commonwealth presented its case primarily through the testimony of two eyewitnesses to the shooting, Francisco Barros and Michael DeJesus. Testifying under a grant of immunity, each of these men stated that he saw the defendant shoot the victim.

2. *Motions to suppress.* The defendant contends that the motion judge (who was different from the trial judge) erred in concluding that the defendant was not in custody when he spoke with Trooper Anne Marie Robertson of the State police and Lieutenant Philip Warrish of the Taunton police department in the New Hampshire State prison (where the defendant was held on unrelated charges) on February 2 and March 11, 2005. (During these interviews the defendant stated that he was present at the murder scene, but denied participating in the shooting.) The defendant also claims that the Commonwealth did not meet its burden of proving that he waived his Miranda rights and spoke to the police voluntarily. The defendant concedes that his Miranda rights were recited to him; it is his contention that he did not effectively waive them.

In reviewing a judge's denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error. See *Commonwealth* v. *Gomes*, 453 Mass. 506, 508-509 (2009); *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978). We determine independently the correctness of the judge's application of constitutional principles to the facts found. *Commonwealth* v. *Mello*, 420 Mass. 375, 381 n.8 (1995). Questions of credibility are the province of the judge who had the opportunity to observe the witnesses. See *Commonwealth* v. *Martin*, 447 Mass. 274, 280 (2006).

Miranda warnings are required only when an individual is subjected to custodial interrogation. *Commonwealth* v. *Morse*, 427 Mass. 117, 122 (1998). To determine whether a defendant is in custody we generally consider four factors: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and

influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest" (*Groome* factors). *Commonwealth* v. *Groome,* 435 Mass. 201, 211-212 (2001), citing *Commonwealth* v. *Morse, supra* at 121-127, and *Commonwealth* v. *Bryant,* 390 Mass. 729, 737 (1984).

This test is "not particularly apposite," however, for determining whether a defendant already behind bars is in custody for purposes of questioning by law enforcement personnel. *Commonwealth* v. *Larkin,* 429 Mass. 426, 434 (1999). In such event, "rather than asking whether a prisoner was free to leave the facility, [courts have asked] whether he is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate." *Commonwealth* v. *Perry,* 432 Mass. 214, 238 n.18 (2000), quoting *Commonwealth* v. *Larkin, supra.* In other words, we seek to determine whether the person is subject to coercion beyond that inherent in ordinary prison life. See *Commonwealth* v. *Larkin, supra* at 435.

The evidence here supports the judge's finding that the defendant was not in custody in these circumstances, i.e., not subject to coercion beyond that inherent in ordinary prison life, when he spoke to the police on February 2 and March 11, 2005. Considering the *Groome* factors in turn, the defendant was interviewed in a room characterized by the motion judge as resembling "more of a neutral site than a correctional setting." The room was in a "more open part of the facility" than his cell block. See *Commonwealth* v. *Larkin, supra* at 435 n.6. "Courts have uniformly found that such a setting militates against a finding of custody." *Id.* In addition, the defendant's handcuffs were removed before the interview began.

There is no evidence that either of the officers conveyed to the defendant the fact that they believed he killed the victim, and the motion judge did not find to the contrary (second *Groome* factor). See *Commonwealth* v. *Morse, supra* at 124. Although the defendant was given his Miranda rights at the outset of each interview, such recitation does not cause the interview to become custodial. See *Commonwealth* v. *Hilton,* 443 Mass. 597, 610 n.7 (2005). In fact, we encourage law enforcement officials to provide

Miranda warnings before the moment at which an encounter becomes custodial rather than to wait until the precise time when the warnings are constitutionally required. See *id.*, citing *Commonwealth* v. *Raymond*, 424 Mass. 382, 393 n.9 (1997).

According to the judge's findings, which are supported by the evidence, the manner in which the interviews were conducted was cordial (third *Groome* factor). "[B]oth interviews were free of antagonism and [neither officer] was overbearing."

With regard to whether the defendant was free to end the interview (fourth *Groome* factor), the motion judge found nothing to indicate that the guard's presence or the use of handcuffs "represented anything more than the usual incidents of bringing an inmate into an area of the prison." Although the officers never told the defendant that he could leave the room if he wished, that factor is not dispositive. See *Commonwealth* v. *Larkin, supra* at 436 n.8. As the judge found, the defendant "controlled the duration of [each] interview." When the defendant indicated that he had nothing more to say, the interview ended. The defendant was not charged at the end of either interview. *Commonwealth* v. *Groome, supra* at 212 (relevant to whether suspect is free to leave is whether he was arrested at conclusion of interview). For the reasons stated, the motion judge concluded correctly that the interrogations were not custodial. Accordingly, no Miranda rights were implicated in the process, and thus, there is no meaningful question whether any of the defendant's rights were voluntarily waived.

3. *Right to testify.* The defendant maintains that he was deprived of his constitutional right to testify in his own defense because his trial attorney did not call him to testify. "[T]he right to testify on one's own behalf in a criminal case is fundamental." *Commonwealth* v. *Novo*, 442 Mass. 262, 268 (2004), quoting *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000). A right fundamental to a fair trial must be waived knowingly and intelligently. See *Commonwealth* v. *Santos*, 402 Mass. 775, 783 (1988), quoting *Spence* v. *Reeder*, 382 Mass. 398, 411 (1981). The decision whether to testify is an important strategic one to be made by the defendant in consultation with his attorney. *Commonwealth* v. *Degro, supra* at 335. It is the defendant's burden to prove that he did not waive this right knowingly and intelligently. See *Commonwealth* v. *Lucien*, 440 Mass. 658, 671 (2004).

The defendant submitted an affidavit with his motion for a new trial. In the affidavit he states that he would have testified had he been given the opportunity, but that his trial attorney did not consult him on the matter. He adds that, if his trial attorney had asked him or if there had been a colloquy with the trial judge, he would have testified. This self-serving assertion is unsupported by the record, and the judge may disbelieve it. See *Commonwealth* v. *Glacken*, 451 Mass. 163, 170 (2008). The defendant was present in the court room when the judge specifically asked his trial attorney whether he had "an adequate opportunity to discuss with [the defendant] the issue of his testimony in this case." The judge repeated the question and trial counsel replied, "Yes. Oh, yes. We've been over that a number of times." The judge was entitled to rely on trial counsel's representations made in the presence of his client, and to which his client did not object. See *id.* at 170. In addition, as the judge noted in denying the defendant's motion for a new trial, the defendant was present in open court when the judge discussed with his trial attorney whether the defendant was requesting a jury instruction with respect to his decision not to testify.

Regarding the defendant's contention that if there had been a colloquy with the judge he would have testified, a judge is not required to conduct a voir dire to determine whether a defendant has knowingly given up his right to testify in circumstances such as here. It is within the judge's discretion whether to conduct such a colloquy. See *id.*

4. *Ineffective assistance of counsel.* The defendant contends that his trial counsel was ineffective because he failed to call Jamilson Teixeira and Skip Johnson as witnesses; chose not to cross-examine Michael DeJesus; and did not object to the prosecutor's use of leading questions in examining Trooper Robertson. In addition, the defendant alleges that it was manifestly unreasonable for his trial counsel to advise him to waive his right to testify. Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Thus, we

consider whether there was error during the course of the trial and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* at 682. A strategic decision by an attorney, however, constitutes error "only if it was manifestly unreasonable when made." *Commonwealth* v. *Coonan,* 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998).

The defendant contends that Teixeira would have provided significant exculpatory evidence in his behalf. The defendant submitted an affidavit from Teixeira with his motion for a new trial. Teixeira averred that he did not see the defendant in the area of the shooting, but saw the defendant at that time "smoking weed" with two other people in an apartment in the housing project. The fact that Teixeira did not see the defendant in the area of the shooting does not mean that the defendant did not shoot the victim. Moreover, Teixeira's statement is contradicted by the defendant's own statements (made during the prison interviews) that he was present when the victim was shot, but simply did not participate in it. These contradictory statements by the defendant would have provided substantial grist for cross-examination. As the motion judge indicated, "Without doubt, [the defendant] and his counsel considered calling Teixeira as a witness since he was the subject of a Writ of Habeas Corpus issued to the Bristol County House of Correction in order to procure his testimony at trial." The decision did not constitute ineffective assistance; that the defendant was convicted does not mean that the strategy was unreasonable.

The defendant also faults his trial attorney for failing to call Johnson as a witness. Johnson approached defense counsel on a Friday morning, the day after the evidence had closed (but before final arguments), to state that Barros and DeJesus, the two primary Commonwealth witnesses, had been lying, and that the Commonwealth had paid for them to stay at a motel and had given them money to buy "crack" cocaine. Johnson also stated that the two witnesses kept alcohol in their room but hid it from the police and that the men told Johnson that they were telling the police "whatever they wanted to hear" to get these benefits.

In response to this assertion, the prosecutor explained that he had specifically asked the police if there had been any promises, rewards, or inducements made to the witnesses and was told

that "nothing was exchanged." He was aware that the two men had been put up in a hotel, but stated that such assistance was provided at the Commonwealth's urging to remove the two witnesses from the neighborhood of the crime immediately after the defendant was arrested in order to prevent retaliation against them. Defense counsel requested that he be permitted to investigate the matter during the weekend. The judge agreed and continued the case until Monday. He ordered that DeJesus and Barros "be produced," and agreed to issue a summons for Johnson to appear on Monday to testify.

On Monday, defense counsel informed the judge that his investigation had revealed that, approximately one month after the shooting, the Commonwealth had paid for DeJesus and Barros to live in a hotel for six nights, that the Commonwealth had provided them with "minimum amounts of money for food and so on," and that the Commonwealth also helped Barros get treatment at a drug treatment center at that time. The defendant moved for a mistrial to permit him the opportunity to obtain Barros's drug treatment records.

The prosecutor explained again that the police had assisted the two witnesses because they believed their lives were in danger, and stated that he had not viewed the Commonwealth's actions as a "promise, reward or inducement." He added that he had not sought to "hide anything" from the defense counsel. The prosecutor also submitted an affidavit detailing the Commonwealth's actions in respect to the two witnesses in the days after the shooting.

The judge denied the motion for a mistrial. The judge accepted the prosecutor's representation that the Commonwealth had not sought to hide anything from the defense. In regard to the drug treatment records, the judge reasoned that there had been "extensive testimony" in respect to Barros's drug addiction and use of narcotics "on or around" the time of the shooting, and that evidence of an admission to a treatment center one month after the alleged offense presented only a "remote possibility" that any additional exculpatory material would be available.

The Commonwealth and the defendant prepared a stipulation concerning the Commonwealth's assistance to the two witnesses, and the judge read the stipulation to the jury immediately before the closing arguments. The stipulation explained that the

Commonwealth had paid for both witnesses to stay at a hotel for several nights one month after the shooting and that the Commonwealth had given them money for food (one hundred dollars for DeJesus and fifteen dollars for Barros). The stipulation provided also that DeJesus was given some clothing, and that Barros was provided five packs of cigarettes and was driven to a "detox facility."

The defendant has not shown that the failure to call Johnson was manifestly unreasonable. See *Commonwealth* v. *Coonan*, *supra* at 827. The stipulation provided the jury with the main information Johnson possessed, and it did so in a straightforward and precise manner. Trial counsel knew the contents of the stipulation, and its contents would not change (as it might in the case of a live witness) or be subject to cross-examination. Thus, trial counsel generally succeeded in placing before the jury the evidence necessary for the jury to consider that the witnesses could have been influenced improperly.

The stipulation did not contain Johnson's statement that the two witnesses had said that they were telling the police "whatever they wanted to hear" in order to get these benefits. This was a statement that defense counsel reported to the judge and emphasized prior to his investigation. He did not repeat it after the weekend investigation, and as indicated, it was not contained in the stipulation. The issue was not raised in the motion for a new trial, and there is no affidavit that Johnson was prepared to testify to that effect. In addition, it appears from the record that Johnson may have been a reluctant or hostile witness. Defense counsel stated to the judge that Johnson "expressed a combination of a willingness to do this [come into court] and some reluctance to do this." Trial counsel was well aware of Johnson's statement. His absence of reference to it after his weekend investigation suggests that Johnson might have recanted the accusation. In any event, it was not an unreasonable strategic decision to rely on the stipulation rather than calling Johnson as a witness.[2]

The defendant next maintains that his trial attorney was inef-

---

[2]The hotel stay of the two witnesses could reasonably be interpreted as a promise, reward, or inducement. Regardless of the purpose of the police in providing the accommodations, it was incorrect for the prosecutor not to disclose this action.

fective for failing to cross-examine DeJesus in respect to the fact that he initially denied to the police that he had witnessed anything on the night of the murder. As the judge found, this was a tactical decision of trial counsel and one that was not "manifestly unreasonable." "In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance." *Commonwealth* v. *Hudson*, 446 Mass. 709, 715 (2006), quoting *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997). Impeachment of a witness is "fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference. Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion" (footnote omitted). *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001).

Through cross-examination of Trooper Robertson, who testified immediately following DeJesus, defense counsel elicited that DeJesus had originally told the police that he had seen nothing on the night of the shooting, but had simply been playing video games at the time the murder occurred. Trial counsel reasonably could have decided that Robertson would be a more reliable witness through whom to impeach DeJesus than DeJesus himself. DeJesus had been a friend of the victim (he had used drugs with the victim on the day of the murder) and was testifying under a grant of immunity. We cannot say that trial counsel's decision was "manifestly unreasonable."

The defendant claims that his trial attorney should have objected to the prosecutor's use of leading questions in the direct examination of Trooper Robertson. It is clear from sidebar conferences, however, that this was a considered decision agreed to by both parties to keep from the jury any evidence that the defendant was incarcerated when he was interviewed by Trooper Robertson. It was not "manifestly unreasonable" to avoid testimony that the defendant was in custody on other charges. Nor is there any indication that the use of leading questions elicited testimony that would not have been forthcoming in any event.

The defendant argues that it was manifestly unreasonable for trial counsel to advise him to waive his right to testify. If the

defendant had testified, his prior statements made at the two prison interviews would have provided abundant fodder for destructive cross-examination. See *Commonwealth* v. *Bell*, 455 Mass. 408, 421-422 (2009). Nor does this claim warrant an evidentiary hearing. The judge did not abuse his discretion by ruling on the matter on the basis of the affidavits. No substantial issue was raised. See Mass. R. Crim. P. 30 (c) (3), as appearing in 435 Mass. 1501 (2001). See also *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006).

The defendant also argues that, even if none of the above matters requires reversal, the cumulative effect of the mistakes created a substantial likelihood of a miscarriage of justice, and that, consequently, he was denied the effective assistance of counsel. Because we have concluded that there were no mistakes, there was no ineffective assistance.

5. *Delayed disclosure of assistance to a witness.* As stated above, the Commonwealth did not disclose to defense counsel the fact that it had provided the two key witnesses with assistance prior to trial. The defendant contends that the delayed disclosure of this information prejudiced his defense and that the judge abused his discretion in denying a mistrial for this reason. Specifically, the defendant maintains that the treatment records of Barros might have given him significant impeachment material regarding Barros's ability to perceive at the time of the shooting. The simple answer here is that Barros was abundantly examined and cross-examined regarding his drug addictions and his use of drugs the night of the murder. He admitted to being a drug addict, using drugs daily, and using drugs just hours before the shooting. The records in question were for treatment a month after the shooting and could have added little, if anything, to the evidence of Barros's drug addiction that was already before the jury. The judge did not abuse his discretion in denying a mistrial because of the late disclosure of the information concerning Barros's drug treatment.

6. *Contradictory testimony.* The defendant alleges that the contradictory testimony of the witness Lelanie Ocasio created a substantial likelihood of a miscarriage of justice. Accepting the defendant's contention that the witness contradicted herself while testifying, the credibility of a witness is a matter for the jury. *Commonwealth* v. *Cruz*, 442 Mass. 299, 311 (2004).

7. *Closing argument.* The defendant states that the prosecutor misled the jury regarding evidence of premeditation by suggesting that the defendant armed himself for the purpose of killing the victim. The specific language objected to is as follows:

> "First, the armed assault with a handgun. He had to get a handgun. He had to get a handgun. He took that handgun and he placed it into a waistband, concealing it. That's the second step of that purposeful act that the defendant committed in order to get to his ultimate goal of killing [the victim]."

The defendant did not object to the closing argument; thus, we review to determine whether there was an improper argument and, if so, whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Caillot,* 454 Mass. 245, 259 (2009).

The prosecutor must limit closing argument to the evidence and the fair inferences to be drawn therefrom. *Commonwealth* v. *Whitman,* 453 Mass. 331, 345 (2009). Three witnesses testified that they saw the defendant with a handgun. Because the defendant had to obtain the gun before the shooting, the statement that the defendant "had to get a handgun" was not inaccurate. With respect to the placing of the gun in the waistband, "concealing it," Barros and DeJesus both stated that they saw the defendant pull out a gun and shoot the victim. In response to a question regarding where the gun came from, Barros gestured and the judge stated, "The record will reflect the witness gestured towards the area of his waistband." The defendant must have put the gun in his waistband prior to removing it and shooting the victim. The statement was thus a fair inference from the evidence.

8. *Instruction on malice.* The defendant argues that the judge instructed improperly by stating, "As a general rule, you're permitted to infer, but not required to infer, that a person who uses a dangerous weapon on another is acting with malice." The defendant claims that this instruction allowed the jury to convict the defendant on the second or third prong of malice, whereas to convict of murder in the first degree on a theory of deliberate premeditation, the Commonwealth must prove the existence of the first prong of malice.[3] There was no error.

---

[3] The first prong of malice is intent to kill; the second prong is intent to do

In respect to malice, the judge instructed that, to convict the defendant of murder in the first degree, the Commonwealth must prove beyond a reasonable doubt that the killing was committed with malice, and that "[m]alice, as it applies to deliberately premeditated murders, means an intent to cause death. . . . The Commonwealth must prove that the defendant actually intended to cause the death of the decedent. As a general rule, you're permitted to infer, but not required to infer, that a person who uses a dangerous weapon on another is acting with malice."

In the last sentence (which is the one of which the defendant complains), the judge was simply informing the jury that they could infer from the use of a handgun that the defendant intended to kill the victim. It was not error to instruct that one may infer an intent to kill from the use of a firearm. See *Commonwealth v. Oliveira*, 445 Mass. 837, 842-843 (2006).

9. Moffett *claims*. On his own, the defendant raises six additional claims of error. See *Commonwealth* v. *Moffett*, 383 Mass. 201 (1981). We address them briefly. The defendant states that his trial counsel should have challenged the grant of immunity to the witnesses DeJesus and Barros. A defendant lacks standing to make such a challenge. See *Commonwealth* v. *Figueroa*, 451 Mass. 566, 578 (2008). The defendant criticizes his trial counsel for failing to cross-examine one witness to establish that many drug dealers in the project wore coats similar to the one the defendant was identified as wearing on the night of the murder. It is speculative as to what a witness's testimony would have been. Regardless, as stated earlier, absent a failure "to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." *Commonwealth* v. *Hudson*, 446 Mass. 709, 715 (2006), quoting *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). The defendant faults trial counsel for failing to develop a defense of

---

the victim grievous bodily harm; and the third is commission of an act from which, in the circumstances known to the defendant, a reasonable person would know that there was a plain and strong likelihood that death would follow. See Model Jury Instructions on Homicide 12 (1999) (listing three prongs of malice applicable to theory of extreme atrocity or cruelty). See also *id.* at 8 (definition of malice under theory of deliberate premeditation is the intent to cause death).

mistaken identity. But that is precisely what defense counsel attempted to do through cross-examination of the various witnesses. The defendant makes a speculative claim unsupported by evidence that defense counsel failed to hire an investigator familiar with the Taunton housing projects who could have found witnesses who knew the defendant and would testify that he was not present at the shooting.

The defendant claims that it was error to try him separately from an alleged joint venturer, John Jones, while permitting evidence against Jones at the defendant's trial. There is no rule barring introduction of evidence of another person's role in a murder. Finally, the defendant contends that his trial counsel did not show to the jury the meat cleaver that was found in the victim's rear pocket. The defendant acknowledges that the jury were aware that the victim possessed a meat cleaver on the night he was shot. In fact, the meat cleaver was introduced in evidence. In any event, the defense was that the defendant was not the person who shot the victim; thus, the victim's possession of a meat cleaver was irrelevant to the defense.

10. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record and find no basis for exercising our extraordinary power to reduce the verdict or grant a new trial.

*Judgments affirmed.*