## COMMONWEALTH *vs.* ANTHONY GARVIN.

Hampden. January 8, 2010. - May 14, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, New trial, Waiver, Assistance of counsel, Sequestration of witnesses, Motion to suppress, Argument by prosecutor. *Evidence,* Relevancy and materiality, Failure to produce evidence. *Witness,* Impeachment.

A Superior Court judge hearing a criminal defendant's motion for a new trial, in which the defendant alleged that his trial counsel rendered ineffective assistance by preventing him from testifying at trial, did not err in concluding that the question whether the defendant would testify was an open issue at trial; that the defendant made a voluntary, strategic decision not to testify after consultation with trial counsel; and that the defendant's decision not to testify was reasonable because the prosecutor's cross-examination would have emphasized the defendant's consciousness of guilt. [785-789]

There was no merit to a criminal defendant's argument that his trial counsel should have introduced evidence to negate the Commonwealth's evidence of consciousness of guilt and to provide evidence of the defendant's consciousness of innocence. [789]

A criminal defendant was not entitled to a new trial based on an allegation that trial counsel failed to present critical evidence he promised the jury during his opening statement, where trial counsel in fact did present such evidence on all but one promised issue, and where the defendant did not demonstrate that counsel's failure to introduce evidence with respect to that remaining issue was due to circumstances within trial counsel's control. [789-791]

A Superior Court judge hearing a criminal defendant's motion for a new trial, in which the defendant alleged that his trial counsel failed to impeach fully the Commonwealth's eyewitnesses and a jailhouse informant, and also failed to question certain of those witnesses concerning a violation of the witness sequestration order, did not err in concluding that counsel made reasonable tactical decisions that should not be second-guessed and that, in any event, would not have altered the verdict. [791-797]

There was no merit to a criminal defendant's claim that his trial counsel ineffectively pursued pretrial motions to suppress the statement of a jailhouse informant. [797-798]

At a criminal trial, a single remark in the prosecutor's closing argument did not infringe on the defendant's constitutional right to remain silent but rather, when properly viewed in context, constituted a comment on the strength of the Commonwealth's case and the weakness of the defendant's case. [798-799]

INDICTMENTS found and returned in the Superior Court Department on November 12, 2002.

The cases were tried before *Judd J. Carhart*, J., and a motion for a new trial, filed on May 23, 2007, was heard by him.

*Emanuel Howard* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In 2004, the defendant was convicted of the murder in the first degree of the victim, Felipe Santiago, on the theory of deliberate premeditation, and of unlawful possession of a firearm. He appealed. Represented by new counsel, he filed a motion for a new trial and an evidentiary hearing, charging that his trial counsel was constitutionally ineffective and that there was reversible error in the prosecutor's closing argument. He requested a new trial or, alternatively, discovery and funds to acquire additional information to support his motion. After an evidentiary hearing, the motion was denied by the same judge who presided at his trial. The defendant appealed. His claims on appeal arise principally out of his motion for a new trial, which he argues was denied in error. He requests that we remand the case for a more extensive evidentiary hearing on his motion, further discovery, and funds. Alternatively, he argues that we should exercise our power under G. L. c. 278, § 33E, to set aside his conviction and order a new trial. Because we conclude that there was no error in the denial of the defendant's motion for a new trial or in the other issues he raises on direct appeal, and our review of the entire record provides no basis to exercise our power under G. L. c. 278, § 33E, we affirm the defendant's convictions and the denial of his motion for a new trial.

*Facts.* We present the essential facts the jury were warranted in finding, reserving details for our discussion of the issues raised.

Two of three eyewitnesses, Luis Orlando Blanco Moreno, whom we shall call Blanco, and Nelson Aponte, testified to the details of the murder for the Commonwealth. On September 22, 2002, the defendant was standing on the third-floor rear porch of an apartment building in Springfield with Aponte, Blanco, Gabriel Plazaola, and the victim, who was also known as Pupi. The defendant was the only African-American present. Aponte, Plazaola, and the victim were members of the La Familia gang.

The defendant and the victim exchanged heated words. The

defendant walked inside the apartment. Shortly thereafter, the victim, Plazaola, and Blanco were on the back porch, leaning on the rail, facing the back yard. The defendant, who had returned to the porch area, walked up behind the victim and shot him at close range in the back of the neck using a nine millimeter semiautomatic handgun. Aponte testified that, after he shot the victim, the defendant said, "What happened?" and fled. Later that day, Aponte and Blanco, who were acquainted with the defendant, gave statements to police and identified the defendant as the shooter from a photographic array.[1] In exchange for their testimony at trial, both witnesses were promised consideration concerning criminal charges pending against them.[2]

The bullet damaged major blood vessels in the victim's neck, causing a fatal loss of blood. It exited to the left of his upper lip, near his left nostril, fracturing a tooth in the left upper jaw. An empty shell casing and a spent projectile consistent with a nine millimeter semiautomatic pistol, as well as pieces of a tooth and a gold tooth decoration engraved with the name "Pupi," were recovered from the ground below. The spent projectile had struck a nearby building at a point some twelve feet high before it fell to the ground. No weapon was recovered. There was no physical evidence linking the defendant to the shooting.

After fleeing to New York and then Virginia, the defendant turned himself in to the Springfield Division of the District Court Department on May 27, 2003. Aponte saw the defendant again while the defendant was incarcerated awaiting trial. The defendant stated that he was on "angel dust" at the time of the shooting. He also told Aponte not to testify against him and, in return, the defendant would not reveal that Aponte was a "snitch" for giving a statement about the victim's shooting to police.

Omar Marrero, who shared a cell with the defendant for approximately two weeks, also testified for the Commonwealth. The defendant told Marrero that he shot the victim in the back of the neck because a "kid" who was selling drugs for the defendant refused to continue doing so after the victim told the "kid"

[1]The third eyewitness, Plazaola, also gave a statement to police that identified the defendant as the shooter, but he was not available at trial.

[2]Neither witness had criminal charges pending when they gave statements to police at the time of the shooting.

not to. The defendant also stated that he had his wife tell Plazaola not to testify, see note 1, *supra*, and that he was going to pay two "girls" to say that they tried to rob the defendant at gunpoint, and when the defendant tried to wrestle the gun away, it went off. In addition, after the victim was shot the defendant telephoned the police because "somebody told him they wanted to question him." The defendant went next door to a neighbor's house and "when he saw the police come with their guns drawn, he . . . went on the run."

Marrero also overheard the defendant say to another inmate, Timothy Zanetti, who was a member of La Familia, "That's why I killed your boy," after which Marrero observed an altercation between the two men.

The defendant did not testify. Through the witnesses he called and the cross-examination of the Commonwealth's witnesses, the theory of the defense was that someone else shot the victim and that the shooting was related to a power struggle over leadership of the La Familia gang, of which the victim was a member.[3] The evidence also supported the inference that the defendant was not a member of La Familia or any other gang. The defense asserted that the others who were present that day also were members of La Familia, and were lying to frame the defendant. In addition, the defense used the testimony of an officer from a District Court lockup that he saw the defendant and Aponte talking together at some point after the murder with no apparent hostility between them, to support an inference that, if the defendant actually had shot the victim, members of the La Familia gang would not have been friendly to him. The defense established that the jailhouse informant, Marrero, also was a member of La Familia, which supported the inference that Marrero was participating in the gang's attempt to blame the defendant. In addition, trial counsel also attacked the credibility of Marrero, Aponte, and Blanco, emphasizing that the Commonwealth promised each consideration concerning criminal charges pending against

---

[3]The defendant appears to argue that trial counsel was ineffective because his defense was based primarily on the cross-examination of the Commonwealth's witnesses. The argument has no merit. See, e.g., *Commonwealth v. Garuti*, 454 Mass. 48, 51-60 (2009) (affirming conviction where no witnesses called by defense; defense theory offered through cross-examination of Commonwealth witnesses).

them in exchange for their testimony.[4] Moreover, trial counsel elicited from Blanco that shortly after the shooting he washed blood, presumably the victim's, off his shoes.[5]

In his closing argument, trial counsel argued that the defendant's asking "What happened?" after the shooting was evidence of his innocence because they were not the words of a "cold-blooded killer" who "turned himself in." He stated that the reason that the defendant was identified as the shooter was because he was the only African-American the witnesses had seen previously at the apartment. He derided the Commonwealth for focusing exclusively on the defendant at the behest of Aponte and Blanco. He again attacked the credibility of Aponte, Blanco, and Marrero, calling them "liars all," who were trying to help themselves, and stated that La Familia gang members stand together. He pointed out that Aponte was a witness in a different murder case and argued he was "well on his way to earning the government murder witness merit badge." Counsel implied that Aponte was the shooter, twice stating that people who stood next to Aponte "end up dead." He asked why Aponte, who was a childhood friend of the victim, was friendly to the defendant in the lockup if he were so grieved by the victim's murder. Concerning Marrero, counsel emphasized that he seemed to have been a jailhouse "snitch" more than once, given that he had been moved around to many cells before he ended up sharing a cell with the defendant. He further implied that Marrero was placed in the defendant's cell by the Commonwealth. Trial counsel also attacked the credibility of Blanco's testimony that everyone fled the porch immediately after the shooting and followed the defendant into the apartment. He pointed out that they did not flee by using the stairs to the porch, thereby taking a route that would have led them *away* from the defendant, whom they allegedly saw shoot the victim (and who still presumably possessed the

---

[4]Trial counsel also attacked the ballistics evidence by eliciting from the Commonwealth's expert that he could not say for certain whether the spent shell and casing found on the ground was the one used to kill the victim. His own expert testified to the same and opined that the Commonwealth expert was mistaken that the spent shell struck a nearby building before falling to the ground.

[5]Right after the shooting, Aponte, Blanco, and Plazaola fled the porch. Aponte returned immediately. Plazaola and Blanco ran to a nearby apartment building to get Plazaola's mother. While the pair were at the mother's apartment, Blanco took the time to wash blood from his shoes.

gun), but rather they followed after him into the apartment. Moreover, trial counsel argued that the ballistics evidence did not assist the jury in evaluating the defendant's guilt or innocence.

*Discussion.* In his amended motion for a new trial, the defendant argued that he received constitutionally ineffective assistance of his trial counsel, alleging that he prevented him from testifying at trial; failed to introduce evidence to negate consciousness of guilt evidence; failed to present, through the defendant's testimony, critical evidence he announced in his opening statement to the jury; failed to present a viable defense; failed to impeach fully the two eyewitnesses and jailhouse informant Marrero; and ineffectively pursued motions to suppress the statement of Marrero. He also argued that a remark in the prosecutor's closing improperly infringed on his constitutional right to remain silent.

The judge, who also was the trial judge, denied the motion after an evidentiary hearing limited to the issue whether trial counsel prevented the defendant from testifying. The defendant argues that the judge erred in denying his motion for a new trial, and abused his discretion in not allowing appellate counsel to testify at the evidentiary hearing and in limiting the scope of the hearing. "Where the denial of a motion for a new trial 'is considered . . . in conjunction with a defendant's direct appeal from a conviction of murder in the first degree,' we must determine whether, under G. L. c. 278, § 33E, there was a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Morgan*, 449 Mass. 343, 353 (2007), quoting *Commonwealth* v. *Hill*, 432 Mass. 704, 710 n.14 (2000).

In considering a claim of ineffective assistance of counsel, the defendant must show that there was an error and that the error likely influenced the jury's decision. *Commonwealth* v. *Horton*, 434 Mass. 823, 831 (2001). Counsel's strategic and tactical decisions are error only if they were "manifestly unreasonable when made." *Commonwealth* v. *Frank*, 433 Mass. 185, 190 (2001), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999). "A list of subjective critiques of defense counsel's decisions, absent a showing that errors likely affected the jury's conclusions, is insufficient to support an ineffective assistance claim." *Commonwealth* v. *Horton, supra*, quoting *Commonwealth* v. *Fisher*, 433 Mass. 340, 354 (2001).

We now provide some context that informs our discussion of
the specific issues the defendant raises. At the evidentiary hear-
ing on the defendant's motion for a new trial, trial counsel, a
defense investigator, and the defendant testified. Through an af-
fidavit submitted in support of his new trial motion as well as
his testimony at the hearing, the defendant offered the following
version of events, which he claims would have supported a
defense of self-defense or accident. He and the victim exchanged
heated words over whether the victim was going to "beat up" a
young "kid." After the exchange, the defendant overheard the
victim on the telephone asking someone to "[b]ring the thing,"
which the defendant knew meant a gun. The defendant was go-
ing to leave the premises, but Aponte tried to rob him at gunpoint.
As the defendant attempted to wrest the gun away from Aponte,
it fired and a bullet hit the victim. The defendant further as-
serted that trial counsel did not discuss the defense strategy
with him and that he did not learn what the defense would be
until trial counsel gave his opening statement.

Trial counsel testified that he had no recollection that the
shooting involved a robbery. Rather, when he interviewed the
defendant about his version of events, trial counsel was under
the impression that the defendant was in the process of selling
narcotics "at the location," and that the defendant shot the
victim. Trial counsel's testimony was supported by the testimony
and affidavit of the defense investigator who, in discussing the
version of events the defendant gave him before trial, stated that
there was a struggle over a gun between the defendant and
Aponte, but there was no mention of robbery as a motive.[6]

Here, as the defendant concedes, it is apparent from the denial
of the defendant's motion that the judge did not find the defend-
ant's affidavit or testimony credible.[7] See *Commonwealth* v.
*Dubois*, 451 Mass. 20, 29 (2008), citing *Commonwealth* v.
*Thomas*, 399 Mass. 165, 167 (1987) (motion judge has discretion

---

[6]Specifically, the defense investigator referred to Aponte as the person with
whom the defendant struggled over the gun. However, it is clear from the
investigator's testimony that he may have believed that Aponte was the victim's
name. In his affidavit, the investigator states that the defendant told him that
the struggle was because "Aponte" "threatened him with a hand gun" and
"the gun went off."

[7]The defendant argues that the judge abused his discretion in denying his
request that appellate counsel be allowed to testify at the evidentiary hearing

to determine credibility of affidavit, especially if judge also presided at trial). Accordingly, we reject, as without merit, all the defendant's arguments based on the premise that the shooting was the result of Aponte's attempt to rob him. As discussed below, the judge also rejected the defendant's assertion that defense counsel did not consult with him about the defense strategy, which the defendant claims he did not learn about until trial counsel gave his opening statement.

1. *Waiver of right to testify.* A defendant's right to testify on his own behalf is fundamental. *Commonwealth* v. *Degro*, 432 Mass. 319, 335 (2000), citing *Harris* v. *New York*, 401 U.S. 222, 225 (1971). The decision whether to testify must be made by the defendant in consultation with counsel. *Commonwealth* v. *Degro, supra,* quoting *Commonwealth* v. *Freeman,* 29 Mass. App. Ct. 635, 640 (1990). The decision must be "an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.' " *Commonwealth* v. *Degro, supra,* quoting *Commonwealth* v. *Freeman, supra.* In his written memorandum of findings and rulings on the defendant's new trial motion, the judge found that the defendant "made a voluntary, strategic decision not to testify after consultation with [trial counsel]."

The defendant argues, as he did in his new trial motion, that but for the actions and inactions of trial counsel, he would have testified at trial and presented a version of events that would

on the issue of the defendant's waiver of his right to testify, without having to withdraw from his representation of the defendant.

Appellate counsel wanted to testify to his own posttrial conversations with trial counsel concerning his representation of the defendant in order to impeach trial counsel's testimony concerning his interactions and conversations with the defendant on the issue whether the defendant should testify. This was unnecessary because the defendant himself testified to his version of conversations with trial counsel, which properly focused the issue on what actually transpired between trial counsel and the defendant. Appellate counsel also wanted to testify to the reasons trial counsel would not consent to signing an affidavit in support of the defendant's motion for a new trial, and to testify to a litany of things that he asserted trial counsel *did not reveal* during their conversations about the defendant's trial. The former were rendered moot by trial counsel's testimony, and the latter were not in reference to any actual statements by trial counsel. Cf. *Commonwealth* v. *Farley,* 443 Mass. 740, 750, cert. denied, 546 U.S. 1035 (2005), citing *Commonwealth* v. *West,* 312 Mass. 438, 440 (1942) (testimony may be impeached by prior inconsistent or conflicting statements offered through other witnesses). There was no abuse of discretion.

have personalized him to the jury and warranted an instruction on self-defense or accident. A defendant bears the burden of showing by a preponderance of the evidence that his waiver of the right to testify was not valid. *Commonwealth* v. *Lucien*, 440 Mass. 658, 671 (2004).

Concerning the allegation that trial counsel prevented him from testifying, the judge's findings, which are fully supported in the record, are as follows. Trial counsel visited the defendant prior to trial several times. Throughout his representation of the defendant, trial counsel advised the defendant "in the strongest possible terms" not to testify. He did not think that the version of events that the defendant gave to him amounted to a viable self-defense claim. However, because the defendant "expressed a continuing interest" in testifying, trial counsel retained another attorney (retained counsel), who would have conducted the direct examination. Trial counsel testified that he never conducts a direct examination of his client because he believes he is not particularly skilled at it and that, given the system under which attorneys have to operate, he wants to insulate himself from the resulting ethical considerations should a defendant testify. Trial counsel further testified that he did not know what the defendant's testimony would have been.

As the judge found, the question whether the defendant would testify was an open issue at trial. The defendant and retained counsel had a full discussion of the "prospect of the defendant testifying" during a weekend break in the trial, after which retained counsel advised the defendant not to testify. In addition, "the defendant conferred with [trial counsel] for twenty-nine minutes prior to the conclusion of the defendant's presentation of evidence, at which time [trial counsel] discussed the defendant's right to testify with him. After the meeting, [trial counsel] announced that the defendant would not be testifying at trial, and the defendant did not indicate any conflict with this assertion."[8] "The judge was entitled to rely on trial counsel's representations made in the presence of his client and to which

_____
[8] On these facts, no colloquy on a defendant's waiver of the right to testify was necessary. See *Commonwealth* v. *Smith*, *ante* 476, 481 (2010); *Commonwealth* v. *Ramirez*, 407 Mass. 553, 556 (1990), citing *Commonwealth* v. *Hennessey*, 23 Mass. App. Ct. 384, 388-390 (1987). The record does not support the defendant's assertion that he did not participate in his defense and did

his client did not object." *Commonwealth* v. *Smith, ante* 476, 481 (2010), citing *Commonwealth* v. *Glacken,* 451 Mass. 163, 170 (2008). Moreover, the defendant stated that he knew he could have testified had he so desired.

The defendant nevertheless claims that he did not testify because trial counsel continuously discouraged him from testifying; he had no time to develop a relationship with retained counsel, who was going to elicit the defendant's testimony, and was fearful that if trial counsel did not handle his testimony, the jury would interpret that as trial counsel's lack of faith; he feared that the Commonwealth would use his out-of-State juvenile criminal record against him; trial counsel assured him that they were ahead in the case; and trial counsel did not properly prepare him to testify.[9] We agree with the judge that the defendant's decision not to testify was reasonable because he would be subject to cross-examination about his flight.

As was evident from his cross-examination of the defendant at the hearing on the motion, had the defendant testified at trial, the prosecutor's cross-examination would have emphasized the defendant's consciousness of guilt. The defendant agreed that he had "no beef" with the victim, who was among a group of people with whom the defendant would "smoke weed [and] chill." However, the defendant did not call for help after the shooting. Instead, before he fled to New York, the defendant stopped at home. While he was bathing his child, "someone" telephoned and spoke to his wife, apparently telling her that police were looking for the defendant. He wanted a "quieter"

not realize that he had the right to speak up. Indeed, during the trial, trial counsel had to ask for a recess, which lasted twenty minutes, when the defendant indicated that he was unhappy with trial counsel's cross-examination of Aponte, and at the evidentiary hearing, he disrupted trial counsel's testimony that he knew nothing about a robbery, blurting out, "I don't believe this. This is ridiculous. He's sitting here lying on your stand, Your Honor."

[9]We agree with the judge's statement at the hearing that the juvenile record issue was minor. We also note that trial counsel requested that the jury be informed that another attorney (retained counsel), who would conduct the direct examination of the defendant, be mentioned as an attorney who might be assisting him in the trial. The jury were informed of this twice before the start of testimony, and retained counsel did join trial counsel on the fifth day of trial, with the defendant's consent. Trial counsel further testified that he did not prepare the defendant to testify and did not know if retained counsel had, but that retained counsel used "role playing" with the defendant in her interview with him.

place to talk to police and went to a neighbor's house. He telephoned police and gave his name and address so that they could talk to him, but then hung up. He telephoned the police again, more than once, but kept hanging up because he did not want police recording his call. He went home to change his clothes and shoes and went to another neighbor's house, where his friend Kalem Daniels resided with his mother and stepfather. From Daniels's room, located in the "loft" of that house, the defendant watched while police arrived and, according to the defendant, had their guns drawn when they got out of their vehicles. The defendant watched as police chased and handcuffed Daniels, who was released only after his mother showed the police identification confirming that Daniels was not the defendant. The defendant further stated that he did not go outside to the police at that point because he believed he would be arrested and accidentally shot. Once he fled to New York City, he tried telephoning the police again but hung up when he thought that the call was being traced. He also claimed to have contacted an attorney in Springfield, who would have helped him turn himself in, but the defendant claimed he did not have the attorney's fee of $500.

The defendant's attempt to telephone police and his decision to flee after the police arrived with guns drawn was admitted through Marrero's testimony.[10] Presenting other details would have created a risk that the jury would have found incredible the defendant's explanation for why he fled the scene of an alleged accident without seeking help for the victim, telephoned police from a neighbor's home instead of his own home, changed his clothes, watched while his friend was apprehended, never approached police with his account of the shooting he asserts was accidental, hung up when he telephoned police, and fled to New York. As the judge found, the defendant's argument that his "absence was explainable [is] unpersuasive and speculative." Where this evidence could have cut either way, the defendant has not shown that his testimony would have altered the verdicts. See *Commonwealth* v. *Scott*, 428 Mass. 362, 367-369 (1998).

For the same reason, we are not persuaded by the defendant's

---

[10]We reject as meritless the defendant's argument that we cannot consider Marrero's testimony because trial counsel called him a liar.

argument on direct appeal that trial counsel's preference of not conducting a direct examination of his clients conflicted with his obligation to put the defendant's interests before his own and shaded the advice he gave the defendant concerning testifying.[11] Furthermore, the defendant's assertion that trial counsel should have withdrawn before trial has no merit, as there is no support in the record for the defendant's claim that trial counsel "knew" that the defendant was planning to commit perjury.[12]

2. *Consciousness of innocence.* There also is no merit to the defendant's argument that trial counsel should have introduced evidence to negate the evidence of consciousness of guilt and to provide evidence of the defendant's consciousness of innocence. In support of his motion, the defendant provided affidavits confirming that the defendant telephoned police after the shooting and hid in Daniels's bedroom when police came to apprehend him. However, it is clear that trial counsel's tactic was to minimize the emphasis on the defendant's flight. The record shows that, following Marrero's testimony about the defendant's actions right after the shooting (including his flight), trial counsel agreed to stipulate that the defendant turned himself in. In addition, in closing argument, trial counsel claimed that his turning himself in to police was evidence of the defendant's innocence. The defendant's flight also was inconsistent with the defense theory that the defendant was not the shooter.[13]

3. *Defense strategy.* The defendant claims that trial counsel

[11]We reject as speculative the defendant's argument that an attorney without such a "conflict" would have asked the defendant what he was going to say if he testified.

[12]We likewise reject the defendant's assertion that trial counsel's identifying Aponte as the shooter as part of the defense strategy violated Mass. R. Prof. C. 3.3, 426 Mass. 1383 (1998), and Mass. R. Prof. C. 4.1 (a), 426 Mass. 1401 (1998), where that assertion also is premised on the erroneous assumption that trial counsel knew the defendant would commit perjury.

[13]The defendant identifies four specific witnesses (besides himself) he claims trial counsel should have called to negate his consciousness of guilt and present his consciousness of innocence. Even assuming, arguendo, that the judge found the affidavits credible, there was no hearsay issue, and the defendant's inculpatory statements would have been admissible, we conclude there was no ineffective assistance of counsel. Before trial, the first neighbor whose house the defendant went to, Leroy Codrington, refused to give a statement to the defense investigator and apparently telephoned the court when he was subpoenaed to appear as a witness, claiming that he knew nothing about

also was ineffective because he failed to present critical evidence he promised the jury during opening statements and did not present a coherent defense.

In his opening statement, trial counsel promised to prove the following: that the victim, Aponte, and Plazaola were members of the La Familia gang and the defendant was not; that Aponte and not the defendant was the shooter; and that the defendant attempted to contact police three times and was going to surrender but decided not to turn himself in when he saw that police had their guns drawn. The defendant argues that trial counsel did not deliver on his promise of such evidence. However, all but Aponte's being the shooter was admitted in evidence, albeit not in the form that the defendant claims it should have been.

Concerning Aponte being the actual shooter, trial counsel's strategy was to use gang evidence to show motive for the murder, i.e., that the victim was a leader in the gang and was killed so that someone else could take his place. At trial, trial counsel stated, in an offer of proof for which the defendant was present, that the defense was focused on Aponte because of what the defendant told counsel. The focus on Aponte also is not inconsistent with the story the defense investigator elicited from the defendant. See note 6, *supra.* During his cross-examination of Aponte, although trial counsel was able to elicit that there was a hierarchy in La Familia, Aponte stated that he did not know whether the victim was "a high ranking member." Trial counsel also expected that the gang management officer from the house of correction would testify to the hierarchy of the La Familia gang. However, the officer was only able to testify to

---

the case. According to the investigator, Codrington witnessed the defendant telephoning police and stated that the defendant told him that Aponte shot the victim. There is no indication that the defendant mentioned a robbery to Codrington. Daniels's affidavit focuses on his own encounter with police, who mistook him for the defendant. Concerning the defendant, it states only that the defendant was agitated and that he remained in the loft when police arrived. The defendant also submitted an affidavit from Daniels's stepfather, who averred that the defendant said someone tried to rob the defendant at gunpoint, but the affidavit does not mention a shooting and states that the defendant did not tell the stepfather that someone was killed. The defendant also submitted a police report documenting the defendant's telephone call, but it shows that the defendant telephoned twice, but hung up quickly each time. It is not clear how this information would have aided the defense, and it was not manifestly unreasonable for trial counsel to conclude that emphasizing the defendant's flight would harm his defense.

the hierarchy within the house of correction. Marrero also was questioned about gang hierarchy, but knew nothing.

In determining whether failure to produce evidence promised in an opening statement is ineffective assistance of counsel, we look at whether there was some incompetency in the preparation of the statement and whether the failure to produce evidence was due to events beyond counsel's control or had strategic justifications. *Commonwealth* v. *McMahon*, 443 Mass. 409, 425 (2005), and cases cited. The defendant has not shown how the failure to prove Aponte was the shooter was not due to circumstances beyond trial counsel's control. Counsel attempted to elicit information about the hierarchy of the gang but could not. Counsel did not abandon the argument that the shooting was gang related and that the defendant did not do it, even though he could not blame Aponte directly. As discussed, in his closing argument, trial counsel still argued that the La Familia gang members stood together and that those who stood next to Aponte ended up dead.[14] He ridiculed the gang management officer's testimony that he did not know about La Familia's hierarchy outside the prison. He also argued that, in order to find the defendant guilty, the jury would have to believe all the Commonwealth's witnesses, who, counsel argued, had motive to lie. There was no ineffective assistance of counsel.

The defense that trial counsel put forward has been detailed *supra*. We do not agree with the defendant that it was not coherent.[15]

4. *Impeachment of witnesses.* The defendant argues that trial counsel's impeachment of the eyewitnesses and the jailhouse informant was incomplete. " 'In general, failure to impeach a witness does not prejudice the defendant or constitute ineffec-

---

[14]We do not agree with the defendant's assertion that trial counsel's statement during closing, "[Aponte] is not a murderer," is a retreat from the defense theory. Read in context, this was one of several sarcastic comments trial counsel made during his closing argument.

[15]We also do not agree with the defendant's bald assertion that trial counsel was ineffective for not realizing that it would be difficult to show that Aponte was the shooter. See note 6, *supra*. Nor do we concur with the defendant's assertion that trial counsel's use of other evidence in closing argument, such as ballistics evidence, to augment reasonable doubt was somehow ineffective assistance of counsel.

tive assistance.' *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997). . . . 'Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference. . . . Furthermore, absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion.' . . . *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001) . . . ." *Commonwealth* v. *Hudson*, 446 Mass. 709, 715 (2006). Here, the judge did not err in concluding that trial counsel made reasonable tactical decisions that should not be second-guessed and that, in any event, the verdict would not have been altered.

a. *Blanco*. Approximately one year after the shooting, but before trial, Blanco signed an affidavit, witnessed by the defendant's investigator, in which he stated that he was not present on the porch at the time of the shooting and thus his initial statement to the police implicating the defendant in the shooting was false. Blanco further stated that he had signed his statement to police because he was told that if he did not, he would be charged with murder. The defendant argues that this recantation should have been used to impeach Blanco at trial. Although trial counsel did not present the document to Blanco, in response to explicit questioning on cross-examination, Blanco twice denied he was ever coerced into giving a statement to police. This was sufficient to probe his recantation. We do not agree with the defendant that there was no "apparent downside" to bringing in the statement itself. There is no evidence concerning the reason he recanted, and it appears that, at the time of the recantation, Blanco and the defendant were both in the same correctional facility. See *Commonwealth* v. *Hudson, supra* at 723 (no ineffective assistance of counsel where jury could have viewed defendant's procurement of affidavits of fellow inmates as attempt to manufacture impeachment evidence). Trial counsel would have risked Blanco stating something negative about the defendant.

Blanco and Aponte each testified that the other was present on the porch when the shooting occurred. Blanco stated that he was sitting on a milk crate behind the victim. However, in their

statements to police, they did not mention each other's presence on the porch. The defendant argues that trial counsel should have used Blanco's statement to police as a prior inconsistent statement to impeach him, and used Blanco's recantation to impeach Aponte's testimony that Blanco was present on the porch. The defendant has not shown how this further impeachment would have affected the verdicts. Trial counsel's challenge to Blanco's presence on the porch was significant enough that the prosecutor used a witness to identify a milk crate visible in a photograph of the porch. More important, however, is that pursuing this issue would have run the risk of diverting attention from the defense theory that someone else on the porch, possibly Aponte, shot the victim and the other witnesses were lying to frame the defendant and were receiving deals from the Commonwealth to testify.[16]

On cross-examination, in response to six questions from trial counsel, Blanco testified that he had not met with police after he gave his statement to them. However, on redirect, Blanco indicated that he recently had met with the prosecutor. A detective subsequently testified that he had met with Blanco the day before in the lockup (apparently at the same time as the prosecutor). The defendant argues that trial counsel should have recalled Blanco to confront him with these inconsistencies. Even assuming that there is an inconsistency here, this was hardly the type of inconsistency that would render a decision not to follow it up, which may well have been strategic, ineffective assistance of counsel. In addition, as the inconsistencies were already before the jury, recalling Blanco would have been cumulative.

b. *Aponte.* In an attempt to impeach Aponte's testimony that the defendant threatened Aponte with revealing he was a "snitch" if Aponte testified against him, trial counsel asked Aponte whether he and the defendant shook hands when they were together in the lockup. Aponte denied it. In rebuttal, trial counsel called the officer who had observed the exchange between Aponte and the defendant. The officer testified that he saw Aponte and the defendant talking to each other, and that their demeanor was

---

[16]For the same reasons, we reject the defendant's argument that Aponte should have been confronted with the contradiction between his statement to police and his testimony that Blanco was present on the porch.

"nice" with "no hostility or anything like that." The defendant makes much of the fact that the officer did not confirm that the two shook hands, arguing that the reason the officer did not recall the handshake was because trial counsel waited several months before speaking to the officer about the incident. There was no ineffective assistance of counsel, as a handshake would have been cumulative of the main point, which was that Aponte and the defendant apparently were on friendly terms after the murder.[17]

c. *Plazaola.* At trial, the Commonwealth stated that it could not find the third eyewitness to the shooting, Plazaola. However, the manager of the apartment building testified that just after the shooting Plazaola ran past him, saying, "The black kid just shot Pupi." The statement was admitted as an excited utterance.

The defendant criticizes trial counsel for not keeping track of Plazaola and argues that Plazaola should have been impeached through his prior convictions and prior inconsistent statements. This argument has no merit. Trial counsel impeached Plazaola's excited utterance by eliciting from Blanco, who had fled the scene of the shooting with Plazaola and who had never lost sight of him, that Plazaola never spoke to the manager. See note 5, *supra.* Trial counsel's tactic of avoiding having this third eyewitness testify that the defendant shot the victim was not manifestly unreasonable, even if the possibility of impeachment existed, especially where it was possible that Plazaola also would have testified, consistent with Marrero's testimony, that the defendant's wife told Plazaola not to testify.[18]

---

[17]Trial counsel told the judge that the officer was fearful for his safety and the safety of his family and requested that the court room be closed during this testimony. The judge denied the request. The defendant's attack on trial counsel concerning this point is specious and contradictory. On the one hand the defendant attacks trial counsel for not fully researching the issue whether a judge may close a court room so that he could have persuaded the judge to do so, even as the defendant offers no compelling reason why the judge should have closed the court room. See *Commonwealth* v. *Edward,* 75 Mass. App. Ct. 162, 171-172 (2009), citing *Globe Newspaper Co.* v. *Superior Court,* 457 U.S. 596, 606-607 (1982), and *Waller* v. *Georgia,* 467 U.S. 39, 46-49 (1984). On the other hand the defendant essentially states that trial counsel was lying about the officer's fear. In an affidavit submitted in support of the defendant's motion, the officer stated that he was not afraid when he testified and did not express fear to trial counsel.

[18]According to the defendant, he was friendly with Plazaola. It was not manifestly unreasonable for trial counsel to avoid having a friend of the defendant testify to his culpability in the shooting.

d. *Marrero.* The value of Marrero's testimony to the Commonwealth was that he provided motive for the shooting. Marrero, who was facing a potential prison sentence of two life terms on armed robbery charges, was impeached extensively. Trial counsel elicited that Marrero first telephoned a State trooper about the defendant's confession. When "nothing happened," he wrote a letter to a district attorney offering the defendant's confession in exchange for being moved to another prison, which was done. He gave a statement to police and testified at trial in accordance with the promise of his cooperation being taken into consideration in his sentencing for the robbery charges. Marrero also admitted that he waived his right to a speedy trial on the charges against him in order to allow him time to testify against the defendant; and that, in order to receive the promised consideration, Marrero had to testify "truthfully," which, to him, meant testifying consistent with his statement to police. To support the inference that the details about the defendant's case to which Marrero testified did not come from the defendant but were acquired surreptitiously, trial counsel asked whether he read the defendant's legal papers, which Marrero denied. Trial counsel also elicited from a prison official that Marrero had informed on a codefendant, supporting the defense theory that he was simply a "snitch."

The defendant's criticism of trial counsel's impeachment of Marrero is based on Marrero's testimony that he witnessed an altercation between the defendant and inmate Timothy Zanetti, after the defendant said, "That's why I killed your boy." Following the altercation, Zanetti spoke to police and stated that the defendant threatened to kill his wife and child and that he was fearful that he also would be killed. Zanetti refused to sign the statement he gave to police, telling the officers that he would not testify in court.

The defendant argues that trial counsel should have further impeached Marrero by calling Zanetti and two other individuals as witnesses, all of whom were incarcerated. According to the defendant, Zanetti could have testified that he twice recanted his statement to police about the defendant. The second witness would have testified that Marrero told him that he read the defendant's legal papers and used the information gleaned therefrom to fabricate statements he ascribed to the defendant.

The third witness would have testified that the defendant never spoke to anyone about his case.

Trial counsel was not ineffective. According to an affidavit of the defendant's mother-in-law submitted in support of the defendant's motion, trial counsel told her that he would not call any witnesses who had criminal records. This is not a manifestly unreasonable trial strategy, given that each could be impeached by his criminal record. See *Commonwealth* v. *Hudson*, 446 Mass. 709, 714, 723-724 (2006) (introduction of affidavits of inmates could undermine defense theory that Commonwealth's case not credible because it relied on testimony of convicts and drug addicts). Furthermore, if Zanetti testified, he could have been impeached by his statement to police. In addition, calling Zanetti as a witness risked the Commonwealth eliciting testimony explaining Zanetti's recantation that was detrimental to the defense, i.e., that Zanetti did not sign the statement he gave police (and ultimately recanted) because the defendant threatened him or his family. See *id.* at 714, 719-720.

The affidavit of the second witness was solicited by the defendant himself.[19] See *id.* at 723 (no ineffective assistance of counsel where jury could have viewed defendant's procurement of affidavits of fellow inmates as attempt to manufacture impeachment evidence). Finally, the witness who purportedly would have testified that the defendant never spoke about his case to anyone did not sign a sworn statement, and in any event, there is no evidence that he was privy to every conversation Marrero had with the defendant while the two men shared a cell together.[20]

e. *Violation of witness sequestration order.* During trial, there was a violation of a witness sequestration order when Marrero, Aponte, and Blanco were placed together in a lockup. Aponte and Marrero had already testified. Trial counsel brought the situation to the attention of the judge, who held a voir dire of

---

[19]The defendant solicited statements from three other inmates. Two contained similar allegations about Marrero reading the defendant's legal papers. The other was from Marrero's codefendant in the armed robbery case, against whom Marrero made inculpatory statements in exchange for leniency. As discussed, the latter fact was elicited through another witness.

[20]Despite the defendant's specious argument to the contrary, we agree with the Commonwealth that, given the testimony of two eyewitnesses, Marrero's testimony, although important for establishing motive, was not critical.

Blanco. The judge found credible Blanco's testimony that the three did not discuss their testimony. Trial counsel subsequently brought this incident to the jury's attention when, on cross-examination, Blanco admitted being with Aponte and Marrero, but denied discussing testimony with them.

The defendant argues that trial counsel should have called another inmate, Presley Williams, who claimed to have overheard the three witnesses talking. The defendant argues that Williams would have been credible because he and the defendant had had a fight and thus were not friends, and that, if Williams testified, "the court would have had discretion . . . to exclude the testimony of those three witnesses, or to declare a mistrial." Had Williams so testified, any issue of witness credibility would have been for the jury. The judge would not have excluded their testimony or declared a mistrial. In addition, the judge found Blanco's testimony that the three did not discuss his testimony credible; Williams's affidavit does not indicate that the men discussed details of testimony; and the comments by the three about receiving "deals" for their testimony already was known to the jury.

5. *Motion to suppress the defendant's statements.* Before trial, trial counsel filed a motion to suppress the testimony of jailhouse informant Marrero. In the motion, trial counsel argued that Marrero acted as a government agent when the defendant spoke to him, making the use of the incriminating statements the defendant allegedly made a violation of the defendant's right to counsel under *Massiah* v. *United States*, 377 U.S. 201, 206 (1964). Trial counsel also asserted that, at the jail, there was a policy of planting informants in the Hampden County inmate population and that it provided the opportunity for informants to gain access to a cellmate's legal papers. After a nonevidentiary hearing, a judge, who was not the trial judge, denied the motion, stating that Marrero was not a government agent at the time the defendant made his incriminating statements and concluded that "[trial] counsel's sweeping claims of conspiracy by the [district attorney]" did not entitle the defendant to an evidentiary hearing. Just before the start of trial, trial counsel filed a second motion to suppress statements of all witnesses who had received or who were expected to receive rewards from the Commonwealth, which was denied by the trial judge.

The defendant makes a convoluted argument that trial counsel should have framed his motions to suppress differently and pressed an argument that Marrero, acting as a government agent, conducted an illegal search and seizure of the defendant's private legal papers, from which Marrero gleaned facts that led him to fabricate the incriminating statements he ascribed to the defendant. We need not belabor the particulars of this flawed argument. The defendant fails to show how the motion judge's decision that Marrero was not acting as a government agent would change, where that conclusion is supported in the record. There was no ineffective assistance of counsel here, nor did the judge err in concluding that there was no merit to the defendant's argument. The judge implicitly found not credible the information contradicting Marrero's testimony regarding the defendant's confession that was submitted in support of the defendant's new trial motion. See *Commonwealth* v. *Dubois*, 451 Mass. 20, 29 (2008), citing *Farley* v. *Sprague*, 5 Mass. App. Ct. 799, 800 (1977), *S.C.*, 374 Mass. 419 (1978) (judge's denial of motion does not permit court to assume truth of affidavit).

6. *Prosecutor's closing.* In his closing argument, the prosecutor summarized the Commonwealth's evidence, including the eyewitness testimony of Aponte and Blanco, the medical examiner's testimony and ballistics evidence supporting their account of the shooting, the defendant's confession to Marrero, and the defendant's flight. He then stated, "All of the evidence that you have heard in this case points to this man as the shooter who ended [the victim's] life. *There was no credible evidence presented in this case that it was anyone other than [the defendant]*" (emphasis added). Trial counsel did not object to this statement.

In his motion for a new trial, the defendant argued, and the judge agreed, that this statement should not have been made. The judge concluded, however, that viewing the comment in context of the entire argument, the evidence adduced at trial, and the judge's instructions to the jury that the prosecutor's comments were not evidence as well as the Commonwealth's burden of proof, there was no substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Robidoux*, 450 Mass. 144, 161-162 (2007).

On appeal, the Commonwealth argues that the prosecutor's

single sentence is more properly viewed in context as a comment on the strength of the Commonwealth's case and the weakness of the defendant's case. See *Commonwealth* v. *Feroli*, 407 Mass. 405, 408-409 (1990) (no error for judge to refuse curative instruction on Commonwealth's comment about the strength of its own case). The Commonwealth is entitled to comment on the strength of its case, as long as argument is directed at the defendant's defense and not at the defendant's failure to testify. *Id.* at 409, quoting *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980). We agree with the Commonwealth that there was no error, given that the sentence came at the end of a summary of the evidence.

In his direct appeal, the defendant argues further that the statement must be viewed in the context of other statements the prosecutor made, which the defendant alleges constituted improper vouching, i.e., saying the witnesses' testimony was consistent with what they had been saying "from day one"; claiming that the witnesses were not impeached; asking, "What kind of conspiracy would have to occur to get all of these witnesses to point their finger at this man if it isn't what happened?"; and commenting on trial counsel's opening claim that Aponte was the shooter by asking, "What evidence was there [that Aponte shot the victim]?" There is no merit to this argument, as all of these comments were grounded in evidence or responded to the defendant's tactics in his final argument recounted above, including that the witnesses were all lying and people who stood next to Aponte end up dead. *Commonwealth* v. *Lamrini*, 392 Mass. 427, 433 (1984), quoting *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 277 (1982). See *Commonwealth* v. *Stote*, 433 Mass. 19, 28 (2000), quoting *Commonwealth* v. *Duguay*, 430 Mass. 397, 404 (1999) (prosecutor may answer arguments made in defense closing).

7. *Evidentiary hearing.* The defendant argues that the judge abused his discretion in refusing to hold an evidentiary hearing on all the issues the defendant raised in his motion for a new trial. There was no error.

"Where the judge was the trial judge, [he] may apply knowledge of the conduct of the trial in making a decision about [a new trial] motion." *Commonwealth* v. *Garuti*, 454 Mass. 48, 57 (2009), citing *Commonwealth* v. *Grace*, 370 Mass.

746, 752-753 (1976). As we have found no error in the denial of the motion for a new trial, it follows that the judge did not abuse his discretion in denying the defendant's request for an evidentiary hearing on all the issues presented in the motion. *Commonwealth* v. *Garuti, supra* at 61, citing *Commonwealth* v. *Britto,* 433 Mass. 596, 608 (2001).

8. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record in light of our statutory obligation and discern no reason to exercise our power to order a new trial or remand the case for further hearings on his motion for a new trial.[21]

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[21]In addition to the issues we have addressed, the defendant, in his brief and reply brief, raises a myriad of other issues, too numerous to mention. We have considered each in light of our duty under G. L. c. 278, § 33E, and conclude that none raises a substantial likelihood of a miscarriage of justice.